THE STATE OF OHIO, APPELLEE, v. FRAZIER, APPELLANT.

[Cite as *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048.]

(No. 2005–1316—Submitted April 4, 2007—Decided October 10, 2007.)

---

LUNDBERG STRATTON, J.

{¶ 1} In this appeal, defendant-appellant, James Frazier, raises 24 propositions of law. We find that none of his propositions of law have merit and affirm Frazier's convictions. We have also independently weighed the aggravating circumstances against the mitigating factors and have compared Frazier's sen-

tence of death to those imposed in similar cases, as R.C. 2929.05(A) requires. As a result, we affirm Frazier's sentence of death.

{¶ 2} The evidence at trial established that, on the morning of March 2, 2004, James Frazier entered 49–year–old Mary Stevenson's apartment and murdered her by strangling her and slitting her throat. Frazier stole two of her purses and fled the scene. Subsequently, Frazier was convicted of the aggravated murder of Stevenson and was sentenced to death.

### State's Case

{¶ 3} The evidence at trial established the following facts. Frazier and Stevenson were both residents of the Northgate Apartments in Toledo. Northgate is a federally subsidized apartment complex, and the residents are low income and either elderly or disabled. Frazier was supported by Social Security disability income, and Stevenson suffered from cerebral palsy.

{¶ 4} During the late summer or early fall of 2003, Frazier baked a cake for Stevenson. Later, Stevenson took the cake pan to Cindy Myers, a social worker at Northgate Apartments, and asked Myers to return the pan to Frazier. Stevenson asked Myers to "tell him thanks for baking the cake but she could do that herself, and * * * she also had a boyfriend." Myers returned the cake pan to Frazier and told him, "Mary said thank you for baking the cake but she can bake herself * * * and not to do it anymore." Frazier responded, "[O]kay."

{¶ 5} On the evening of March 1 and in the early morning of March 2, 2004, Frazier and a group of individuals smoked crack cocaine and drank alcohol inside Frazier's third-floor apartment.

{¶ 6} During the drug party, Frazier provided Chastity McMillen with $200 to $300 worth of crack cocaine without charge. At some point, Frazier's guests ran out of crack. Frazier called someone to deliver more crack, and he also called someone for money to buy it. More crack was brought to Frazier's apartment later that night.

{¶ 7} Frazier was wearing jeans and a white T-shirt during the party. At some point during the evening, Frazier left the party. When he returned, Frazier was not wearing a shirt.

{¶ 8} At 7:17 a.m. on March 2, Frazier made a 911 call to report a woman at the complex lying on the laundry-room floor, having seizures. Paramedics met Frazier at the apartment, but no one needing medical attention was found in the laundry room.

{¶ 9} Stevenson lived alone in a first-floor apartment at Northgate. She supported herself on Social Security benefits. Because of her condition, Stevenson had limited mobility and difficulty speaking. Her apartment was located

about 20 to 30 feet from the laundry room and 15 feet from the elevators close to one of the stairways.

{¶ 10} On March 1, Bill Gangway, Stevenson's boyfriend, and Stevenson talked on the telephone, and they agreed to meet at her apartment the next day. Around 9:00 a.m. on March 2, Gangway knocked on Stevenson's apartment door, but she did not answer. Gangway remained at Northgate for the rest of the day and unsuccessfully tried to contact Stevenson three or four times. At 4:15 p.m., Susan Adams, Northgate's assistant manager, checked on Stevenson. After receiving no answer to her knocking, Adams entered Stevenson's apartment and found her lying on the bedroom floor, dead. Adams then called 911.

{¶ 11} Around 5:00 p.m. on March 2, police arrived at Stevenson's apartment. Stevenson's body was near the foot of her bed. Stevenson's throat had been slashed, and blood had pooled underneath her head and shoulders. She was wearing a nightgown that was tucked into the front of her underpants.

{¶ 12} Police examining Stevenson's apartment found no signs of a struggle, forcible entry, or indication that her apartment had been ransacked. Stevenson's purse and identification cards were missing, and police found no cash in her apartment. Stevenson's apartment key was discovered on her wheelchair in the living room. No knife or other possible murder weapon was found in Stevenson's apartment. However, a knife was missing from the knife holder on the kitchen counter.

{¶ 13} Police used an alternate light source to look for semen or other bodily fluids in Stevenson's bedroom, but police found no evidence of semen on Stevenson's bed, bed sheets, robe, or anything else in the bedroom. Police also searched the area around the apartment building and the Dumpster that was used by first-floor residents, but no evidence was found.

{¶ 14} On March 3, 2004, police investigators examined the sealed trash compactor-Dumpster that was used by Northgate residents living on the second through the tenth floors. During the search, investigators found Stevenson's clutch purse, which contained her birth certificate, bank card, and library card. Two bills addressed to Frazier were located near the clutch purse. Investigators also found Stevenson's Social Security and Medicaid cards, her large black purse, and a Fruit of the Loom T-shirt, size double X, 50 to 52, that had been turned inside out. Frazier is six feet one inch tall and weighs 250 pounds. A knife that matched the set of knives in Stevenson's kitchen was also found and appeared to have blood on it. No money was found in Stevenson's two purses.

{¶ 15} Investigators returned to the police station with the evidence collected from the trash. Bloodstains were detected on the front of the white T-shirt and tested positive for the presence of human blood. The T-shirt and the knife were sent to the lab for DNA testing.

{¶ 16} On March 4, 2004, investigators executed a search warrant of Frazier's apartment. There, police seized two T-shirts that were the same size and had the same manufacturing tags as the T-shirt found in the trash compactor.

{¶ 17} At approximately 2:30 p.m. on March 4, Toledo detectives William Seymour and Denise Knight conducted a videotaped interview of Frazier. After being advised of his *Miranda* rights and waiving them, Frazier stated that sometime after 6:00 a.m. on March 2, he went to the laundry room with a basket of bedding and found a woman lying on the laundry-room floor. According to Frazier, he knocked on Stevenson's door and said he needed to call 911. Stevenson let Frazier into her apartment. Frazier then called 911 and told the operator that there was a lady lying on the laundry-room floor at Northgate Apartments. Frazier left Stevenson's apartment and waited for the paramedics.

{¶ 18} Frazier said Stevenson was fine when he left her apartment. Stevenson locked the door when he left. Frazier said he did not return to Stevenson's apartment after making the 911 call.

{¶ 19} Frazier said the lady was gone when he returned to the laundry room. He told the arriving paramedics that he did not know what happened to the lady. Frazier says he asked Francis Clinton, a fifth-floor resident who was in the laundry-room area, about the lady, and she said, "I didn't see nobody."

{¶ 20} At approximately 9:45 p.m. on March 4, 2004, Detectives Seymour and Knight conducted a second videotaped interview of Frazier. According to Frazier, he watched TV at a friend's apartment until midnight or 1:00 a.m. on March 2. Frazier then returned to his apartment. Sometime after 6:00 a.m., he took a light load of bedding to the laundry room. He repeated that he found an unidentified lady lying on the laundry-room floor, went to Stevenson's apartment, and called 911.

{¶ 21} Frazier said, "Nothing happened out of the ordinary" when he was in Stevenson's apartment. Frazier said that Stevenson had a beautiful personality but claimed, "I never looked at her in a sexual way." He claimed that he was impotent, so he had no interest in sex. Frazier denied throwing away anything that belonged to the victim. However, he admitted, "I threw that T-shirt away." Frazier said, "I did not do this."

{¶ 22} Surveillance cameras at Northgate Apartments provided coverage of the elevators, the main entrances, and the parking lots. However, there were no cameras in the main stairwell next to the laundry room. Police reviewed the surveillance tapes and tracked the movements of Frazier and other residents on the evening of March 1 and the morning of March 2.

{¶ 23} Cameras show Francis Clinton entering the laundry room with a load of clothes at 6:30 a.m. on March 2 and then departing. At 7:16 a.m., Frazier

entered the laundry room with a small bundle of clothes under his arm and then left and walked towards Stevenson's apartment.

{¶ 24} At 7:19 a.m., Clinton returned to the laundry room. At 7:24:11 a.m., Frazier came back to the laundry room with the bundle of clothes under his arms, took a quick look inside, and walked away. At 7:25:02 a.m., Frazier took the elevator to the third floor with the bundle still under his arms. At 7:25:25 a.m., Frazier got out on the third floor. He returned to the elevator at 7:25:50 a.m. without the bundle.

{¶ 25} At 7:25:58 a.m., Clinton left the laundry room and returned to the fifth floor. At 7:26:12 a.m., Frazier returned to the laundry room, took another quick peek inside, and left. At 7:26:44 a.m., Frazier and the paramedics entered the laundry room. At 7:27:14 a.m., they departed. Frazier wore a white T-shirt during this entire sequence of events.

{¶ 26} At trial, Detective Seymour testified that the third-floor garbage chute is close to the elevator. He said it takes approximately 20 seconds to walk at a normal pace to the garbage chute and return to the elevator. Frazier's third-floor apartment is further down the hall. Seymour said that walking at a regular pace to Frazier's apartment and returning to the elevator takes 40 to 45 seconds.

{¶ 27} Dr. Cynthia Beisser, the deputy coroner for Lucas County, conducted the autopsy on Stevenson. The victim suffered a "large sharp-force injury across the neck" that cut "both the carotid arteries and the jugular veins and went through the trachea * * * down to the spine." Stevenson's thyroid cartilage was fractured, and "there was bruising on the undersurface of the chin and on the upper portion of the chest, and * * * blood in the tongue," which showed that she had also been strangled. Dr. Beisser also found vaginal abrasions and lacerations consistent with vaginal intercourse that had occurred while the victim was alive. Dr. Beisser concluded that Stevenson "died of a combination of * * * strangulation and the sharp-force injury to the neck."

{¶ 28} Detective Terry Cousino collected physical evidence during the autopsy, including a hair found on Stevenson's right tricep. The hair was sent to the lab for further testing.

{¶ 29} Staci Violi, a serology expert at the Ohio Bureau of Criminal Identification and Investigation ("BCI"), conducted tests and verified the presence of human blood on the knife blade and on some areas of the T-shirt that had been found in the trash compactor. Test results were also positive for the presence of amylase, a component of saliva, on the neck area of the T-shirt. However, vaginal and rectal swabs obtained during the autopsy tested negative for the presence of semen.

{¶ 30} Brian Bowen, a DNA analyst at BCI, conducted DNA tests on bloodstains found on the knife blade. These tests revealed a partial DNA profile consistent with Stevenson's DNA. Bowen testified that the expected frequency of occurrence of the partial DNA profile found on the knife blade is one in 58,070,000 individuals. DNA testing of the knife handle revealed a "mixture," with the "major DNA type * * * consistent with Mary Stevenson." Bowen also conducted DNA testing of a bloodstain from the T-shirt. These tests provided a full DNA profile consistent with Stevenson's DNA. The expected frequency of occurrence from the DNA on this bloodstain is one in 285,500,000,000,000 individuals.

{¶ 31} Bowen also conducted DNA testing on the amylase stain on the T-shirt. DNA testing resulted in a "partial profile [that] was a mixture, and the major DNA type is consistent with James Frazier." The frequency of occurrence of the DNA from this stain is one in 493 individuals. DNA testing of the neck band of the T-shirt resulted in a mixture, and Frazier's DNA is consistent with the DNA of a contributor to the mixture. Bowen testified that the frequency of occurrence of the DNA from the neck band of the T-shirt is one in 15,500 individuals. However, Bowen's written report states that the expected frequency of occurrence is one in 115,500 individuals. Finally, DNA testing of swabs from the armpit of the T-shirt resulted in a "mixture," and Frazier's DNA is consistent with the DNA of a contributor to that mixture.

{¶ 32} Ted Manasian, an expert in trace evidence at BCI, examined the hair found on Stevenson's right tricep. Manasian testified, "It was found also to be similar * * * to gross physical characteristics to the pubic hairs of James Frazier." Subsequently, the hair was sent to the ReliaGene Corporation for further testing.

{¶ 33} Amrita Lal–Paterson, formerly a senior DNA analyst at ReliaGene Technologies, conducted mitochondrial DNA testing of the hair from Stevenson's arm. Lal–Paterson found that the hair sample is "consistent with the * * * mitochondrial genetic profile of Mr. Frazier, and * * * therefore Mr. Frazier or a maternal relative of his could not be excluded from that particular sample." According to Lal–Paterson, the percentage of people that could be excluded as a potential donor is 99.6 percent of the African–American population, 99.8 percent of the Caucasian population, and 99.6 percent of the Hispanic population.

{¶ 34} Lal–Paterson also conducted Y-chromosome testing of swabs from the T-shirt's armpit. The result of this testing was a "mixture," and the "major contributor was consistent with Mr. Frazier or a paternal relative of his." Lal–Paterson testified that the percentage of the population that could be excluded as

a potential donor is 99.8 percent of the African–American population, 99.7 percent of the Caucasian population, and 99.3 percent of the Hispanic population.

{¶ 35} The defense presented no evidence during the trial phase.

### Case History

{¶ 36} The grand jury indicted Frazier on one count of aggravated murder. Count 1 charged him with the aggravated murder of Stevenson while committing kidnapping, rape, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary, or escape. Count 1 included death-penalty specifications for murder while committing, attempting to commit, or fleeing after committing aggravated robbery, R.C. 2929.04(A)(7), and murder while committing, attempting to commit, or fleeing after committing aggravated burglary, R.C. 2929.04(A)(7). Count 2 charged Frazier with aggravated robbery, and Count 3 charged him with aggravated burglary.

{¶ 37} Frazier pleaded not guilty to all charges. However, the jury found Frazier guilty of all charges and specifications, and he was sentenced to death.

{¶ 38} Frazier now appeals to this court as a matter of right.

### Pretrial and Guilt–Phase Issues

{¶ 39} *Phrasing of voir dire questions.* In proposition of law III, Frazier argues that the trial court erred in advising prospective jurors during voir dire that if the law requires a death sentence, jurors must vote to impose death as a sentence, but if the law requires a life sentence, they must "consider" voting for a life sentence. We find no merit to this argument.

{¶ 40} First, Frazier never objected at trial to the phrasing of these voir dire questions, and he thereby waived the issue absent plain error. *State v. Brinkley,* 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 64; *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus.

{¶ 41} Second, no plain error occurred. During voir dire, each of the sitting jurors was questioned about his or her views of the death penalty. The voir dire of juror Benne typifies the court's line of questioning:

{¶ 42} "THE COURT: Are you religiously, philosophically, morally or otherwise opposed to the death penalty?

{¶ 43} "MS. BENNE: No.

{¶ 44} "THE COURT: Okay. I take it then that you are saying that if, according to my instructions, you would find it appropriate to vote to impose the death penalty in a case, that you would do so?

{¶ 45} "MS. BENNE: Yes.

{¶ 46} "THE COURT: On the other hand, I take it that if, according to my instructions, you find the imposition of the death penalty inappropriate, *you would consider* the three other sentencing options of life imprisonment with parole eligibility after serving a full 25 or 30 years or life imprisonment without parole?

{¶ 47} "MS. BENNE: Yes.

{¶ 48} "THE COURT: If you were a juror in the sentencing phase of the trial, would you automatically impose—vote to impose the sentence of death regardless of the facts of the case, or *would you consider all of the sentencing options*?

{¶ 49} "MS. BENNE: I would consider all of the options." (Emphasis added.)

{¶ 50} Other sitting jurors were questioned in a similar fashion.

{¶ 51} The trial court's use of the term "consider" referred to all of the sentencing options. The trial court frequently used the term "consider" in referring to the choice of life-sentence options. But the trial court never suggested that the jurors may be required to vote for a death sentence, yet only "consider" voting for one of the life sentences. Moreover, we rejected a similar complaint in *Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 85: "the use of the term 'consider' in voir dire was not misleading or improper." Thus, we overrule proposition III.

{¶ 52} ***Batson* challenges.** In proposition of law II, Frazier asserts that the prosecutor peremptorily challenged two African–American prospective jurors because of their race, in violation of their equal protection rights under *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69.

{¶ 53} During jury selection, the prosecutor peremptorily challenged two African–American prospective jurors, Franklin and Robinson. Frazier's counsel objected to the state's use of its peremptory challenges as a violation of *Batson*.

{¶ 54} With regard to prospective juror Franklin, the state explained, "[W]e excused her because she said on record during our one-on-one conference that she was morally opposed to the death penalty * * *. She did not rise to the level of cause but she was one of the people that was close to being cause, and we ask that she be excused." The trial court stated, "Well, that is on the record. * * * And she is excused."

{¶ 55} As to prospective juror Robinson, the state provided two reasons for its peremptory challenge:

{¶ 56} "[Prosecutor] MR. BRAUN: Yes. Well, Your Honor, a couple things. * * * One is a factual issue. We'll have testimony from a number of witnesses that the defendant was smoking crack cocaine on the night before the murder occurred. And this defendant [sic; venire member] is a recovering drug addict.

{¶ 57} "Our main concern, however, in moving for a challenge on him on a peremptory basis was based on his answers during the *Witherspoon* portion of the questioning· where he was unable to articulate whether or not he could actually impose capital punishment. He simply could not answer that question. He had to think about it, and he was the only potential juror who could not tell us one way or the other whether or not he could do it.

{¶ 58} " * * *

{¶ 59} "THE COURT: All right. * * * The *Batson* challenge is on the record. And we'll call the next juror. Thank you."

{¶ 60} Following jury selection, the trial court provided the following additional matters about the *Batson* challenges:

{¶ 61} "THE COURT: * * * [T]here were two *Batson* challenges yesterday. * * * One of the things I wanted to put on the record was that I did a review of the questionnaires that the entire venire answered, the 86 people that we actually talked to. And out of the 86, six people were African American.

{¶ 62} "Now, some of those people * * * were released after our individual voir dire because of challenges or other complications. And I think that the final pool, we only had three in the final 44 that were African American."

{¶ 63} The trial court stated that the prospective jurors were randomly selected from the voter registration list, and the small number of African–Americans in this jury pool is "just one of those things that happened."

{¶ 64} " 'A court adjudicates a *Batson* claim in three steps.' " *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 106, quoting *State v. Murphy* (2001), 91 Ohio St.3d 516, 528, 747 N.E.2d 765. "First, the opponent of the peremptory challenge must make a prima facie case of racial discrimination. Second, if the trial court finds this requirement fulfilled, the proponent of the challenge must provide a racially neutral explanation for the challenge. *Batson*, 476 U.S. at 96–98, 106 S.Ct. 1712, 90 L.Ed.2d 69." Id. Third, the trial court must decide, based on all the circumstances, whether the opponent has proved purposeful racial discrimination. *Batson* at 98, 106 S.Ct. 1712, 90 L.Ed.2d 69. See also *Purkett v. Elem* (1995), 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834. A trial court's finding of no discriminatory intent will not be reversed on appeal unless clearly erroneous. *State v. Hernandez* (1992), 63 Ohio St.3d 577, 583, 589 N.E.2d 1310, following *Hernandez v. New York* (1991), 500 U.S. 352, 368, 111 S.Ct. 1859, 114 L.Ed.2d 395.

{¶ 65} In step three, the trial court may not simply accept a proffered race-neutral reason at face value, but must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual. "[T]he rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the

juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it." *Miller–El v. Dretke* (2005), 545 U.S. 231, 251–252, 125 S.Ct. 2317, 162 L.Ed.2d 196. If the trial court determines that the proffered reason is merely pretextual and that a racial motive is in fact behind the challenge, the juror may not be excluded. Id. at 252, 125 S.Ct. 2317, 162 L.Ed.2d 196.

{¶ 66} In his first argument, Frazier invokes *Miller–El v. Dretke* in arguing that the prosecutor's reasons for peremptorily challenging Franklin and Robinson were simply a pretext for discrimination. In *Miller–El,* the Supreme Court outlined the type of evidence to be considered and the analysis to be used to assess a *Batson* claim. During jury selection in *Miller–El,* prosecutors used peremptory challenges to exclude ten African–American prospective jurors, and the trial court overruled defense claims that the challenges were racially motivated. Id. at 236, 125 S.Ct. 2317, 162 L.Ed.2d 196. The Supreme Court reversed and held that the totality of the evidence showed that the prosecutor's race-neutral reasons for the peremptory challenges of two potential jurors were so at odds with the evidence that pretext is the fair conclusion. Id. at 265–266, 125 S.Ct. 2317, 162 L.Ed.2d 196.

{¶ 67} In *Miller–El,* the court found several disturbing factors that together showed that the prosecutor's reasons for challenging African–American jurors were pretextual: (1) the "bare statistics," which showed that of the 20 African–Americans on the 108–person venire, only one served, and ten African–Americans were peremptorily struck by the prosecution, *Miller–El,* 545 U.S. at 240–241, 125 S.Ct. 2317, 162 L.Ed.2d 196; (2) the similarity of answers to voir dire questions by African–American jurors who were peremptorily challenged and answers by non-African-American prospective jurors who were allowed to serve, id. at 241–252, 125 S.Ct. 2317, 162 L.Ed.2d 196; (3) the broader patterns of practice, which included jury shuffling,[1] id. at 253, 125 S.Ct. 2317, 162 L.Ed.2d 196; (4) disparate questioning of African–American and non-African-American jurors, id. at 255–260, 125 S.Ct. 2317, 162 L.Ed.2d 196; and (5) evidence that the district attorney's office had historically discriminated against African–Americans in jury selection, id. at 263–264, 125 S.Ct. 2317, 162 L.Ed.2d 196.

{¶ 68} Two *Miller–El* factors are not present in Frazier's case. The state did not engage in jury shuffling, and there is no evidence that the Lucas County prosecutor's office has historically discriminated against African–Americans in the jury-selection process.

---

1. Under Texas practice, during voir dire in a criminal case, either side may literally reshuffle the cards bearing panel members' names, thus rearranging the order in which members of a venire are seated for questioning. *Miller–El v. Dretke,* 545 U.S. at 253, 125 S.Ct. 2317, 162 L.Ed.2d 196.

{¶ 69} Frazier's claims are also not supported by the "bare statistics." The absence of African–Americans on Frazier's jury resulted from the few African–Americans randomly selected for the original jury pool. There were six African–Americans out of 86 prospective jurors in the original jury pool for Frazier's trial. There were only three African–Americans out of a final jury pool of 44 prospective jurors. The prosecution exercised five of its six peremptory challenges, and two of these were against African–Americans. The record is unclear as to what happened to the third African–American juror. Thus, the statistics do not establish that the state had a discriminatory intent in peremptorily challenging Franklin and Robinson.

{¶ 70} There is also no evidence of disparate questioning of African–American and non-African-American jurors. In *Miller–El*, the prosecutor made prefatory statements cast in general terms to non-African-American prospective jurors, but he used a more graphic script describing in detail the method of execution to African–American prospective jurors. *Miller–El*, 545 U.S. at 258, 125 S.Ct. 2317, 162 L.Ed.2d 196. The Supreme Court held that the use of the graphic script to a higher proportion of blacks than whites provided further evidence that the prosecution wanted blacks off the jury. Id. at 260, 125 S.Ct. 2317, 162 L.Ed.2d 196. Here, there is no evidence that the prosecutor posed a different type of question to Franklin and Robinson than to the other jurors. Rather, the prosecutor asked questions based upon a juror's previous answers, such as Franklin's statement that she was morally opposed to the death penalty.

{¶ 71} Frazier argues that the state's reasons for excluding Franklin and Robinson (e.g., their uneasiness about the death penalty) were improper because other jurors also expressed uneasiness about the death penalty, but were not peremptorily challenged. In *Miller–El*, the Supreme Court held: "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller–El*, 545 U.S. at 241, 125 S.Ct. 2317, 162 L.Ed.2d 196. Thus, a comparison of the voir dire answers of Franklin and Robinson with the individuals who served on Frazier's jury is required.

{¶ 72} ***Prospective juror Franklin.*** During voir dire, Franklin said that she was opposed to the death penalty on moral grounds. However, Franklin stated that she could set aside her moral views, follow the trial court's instructions, and vote to impose the death penalty if appropriate. During the prosecutor's questioning, Franklin stated that she opposed the death penalty because evidence might later show that the accused was innocent. During voir dire, the following exchange occurred between the prosecutor and Franklin:

{¶ 73} "[Prosecutor] MR. BRAUN: Okay. And Miss Franklin * * * if we get to this stage you're going to have four sentencing options, life with 25 full years in prison without the chance of parole, * * * life with 30 years, * * * life without parole, or the death penalty. *The way you feel about capital punishment, you're really going to consider all the life verdicts first?*

{¶ 74} "MS. FRANKLIN*: Yes, I will.*

{¶ 75} "MR. BRAUN: Okay. And those are the verdicts you're much more comfortable with than the death penalty; isn't that right?

{¶ 76} "MS. FRANKLIN: Yes, I am.

{¶ 77} "MR. BRAUN: And this is just based on your personal beliefs here that the death penalty is something you would just not consider unless—if you had one of the life verdicts available to you. Would that be fair, ma'am?

{¶ 78} "MS. FRANKLIN: Yes." (Emphasis added.)

{¶ 79} Afterwards, the prosecutor challenged Franklin for cause because her moral opposition to the death penalty "substantially impairs her ability to fairly consider the death penalty as an option." The trial court overruled this challenge.

{¶ 80} During voir dire, ten of the sitting jurors told the court that they were not religiously, philosophically, or morally opposed to the death penalty. Juror Wagner stated that he felt "[n]either way" about the death penalty, but would vote for the death penalty, if appropriate.

{¶ 81} Juror Schoch was the only sitting juror who stated that she did not believe in the death penalty. But Schoch's responses differed markedly from Franklin's. Schoch's opinion was based on her view that life without parole was sometimes a worse sentence than death. Schoch also expressed no preference for a life sentence over a death sentence.

{¶ 82} We find that the comparison of Franklin's responses with the sitting jurors' responses does not support Frazier's pretext claim.

{¶ 83} ***Prospective juror Robinson.*** As discussed, Robinson was peremptorily challenged because of his inability to articulate his views about the death penalty and his history of crack cocaine use. Robinson told the trial court that he was "not sure" about his views of the death penalty. When asked whether he could follow the trial court's instructions about the death penalty, Robinson stated, "If you gave me instructions * * * it would probably depend on the evidence I got before that."

{¶ 84} The prosecutor also asked Robinson whether he could follow the court's instructions on the death penalty:

{¶ 85} "[Prosecutor] MR. BRAUN: * * * And what I'm going to ask you, sir, is could you sign your name in ink on a verdict form saying somebody should be executed for a crime they committed? Could you take that kind of responsibility?

{¶ 86} "MR. ROBINSON: I'd have to go back, I'd have to fully hear out all the facts presented to me.

{¶ 87} " * * *

{¶ 88} "MR. BRAUN: Okay. *Do you think you could make that decision if you thought it was warranted by the law and the facts* ?

{¶ 89} "MR. ROBINSON: *If the facts fairly came, I wouldn't know.* I really haven't got that far. I have to go through it to be convinced before I can even say anything that might * * *, I guess, affect me from knowing—I don't want to make that type of decision.

{¶ 90} "MR. BRAUN: Is this the kind of decision you don't want any part of, Mr. Robinson?

{¶ 91} "MR. ROBINSON: I would say yes to that." (Emphasis added.)

{¶ 92} As to drugs, the prosecutor asked Robinson and several other jurors whether friends or family members had "been affected by drugs." Robinson said, "I was an alcoholic and a drug addict." He added, "In 1979 I retired from Chrysler and I went to Flower Hospital and I've been in sobriety ever since going through their step program." Robinson said he has been sober "[g]oing on 26 years" but still attends rehabilitation meetings.

{¶ 93} Several of the sitting jurors indicated that friends or family members used drugs. However, none of these jurors indicated that they had used drugs.

{¶ 94} Unlike sitting jurors, Robinson never clearly articulated whether he could follow the trial court's instructions and vote for the death penalty. Moreover, Robinson had been a drug addict, unlike the sitting jurors. Thus, Robinson's voir dire answers were different from the answers provided by sitting jurors.

{¶ 95} Viewed as *Miller–El* directs, the record does not support Frazier's claim that the prosecution's race-neutral reasons for striking Franklin and Robinson were pretextual.

{¶ 96} In his second argument, Frazier claims that the prosecutor failed to question Franklin and Robinson about the underlying basis for peremptorily challenging them, which shows that the state's reasons for the peremptory challenges were a pretext. This claim has no merit. The record shows that the prosecutor questioned Franklin and Robinson on their views about the death penalty. The prosecutor also questioned Robinson about his history of addiction and alcohol abuse before peremptorily challenging him.

{¶ 97} In his third argument, Frazier asserts that the prosecutor's failure to challenge Robinson for cause because he was a recovering drug addict shows that the state's use of his drug addiction as a reason for its peremptory challenge was pretextual. However, this argument has no merit because the "prosecutor's explanation [for a peremptory challenge] need not rise to the level justifying exercise of a challenge for cause." *Batson*, 476 U.S. at 97, 106 S.Ct. 1712, 90 L.Ed.2d 69.

{¶ 98} Finally, Frazier contends that the trial court's failure to make findings in connection with its ruling requires reversal. Certainly, more thorough findings by the trial court in denying the defense *Batson* objections would have been helpful. However, the trial court is not compelled to make detailed factual findings to comply with *Batson*. See *Miller–El v. Cockrell* (2003), 537 U.S. 322, 347, 123 S.Ct. 1029, 154 L.Ed.2d 931 ("a state court need not make detailed findings addressing all the evidence before it" to render a proper *Batson* ruling). "As long as a trial judge affords the parties a reasonable opportunity to make their respective records, he may express his *Batson* ruling on the credibility of a proffered race-neutral explanation in the form of a clear rejection or acceptance of a *Batson* challenge." *Messiah v. Duncan* (C.A.2, 2006), 435 F.3d 186, 198. Thus, no error was committed in ruling on Frazier's two *Batson* challenges, because the trial court clearly rejected them.

{¶ 99} Based on the foregoing, we overrule proposition II.

{¶ 100} *Outside contact with juror.* In proposition of law VI, Frazier argues that the trial court erred by failing to dismiss juror Kennedy because she had been approached by a relative of one of the state's witnesses. In the alternative, Frazier argues that his counsel were ineffective by failing to request that juror Kennedy be dismissed from the jury.

{¶ 101} Before guilt-phase opening statements, juror Kennedy notified the bailiff that someone had approached her at a softball game and asked whether she was on jury duty. The trial court then conducted an in-chambers hearing to determine whether improper contact had occurred.

{¶ 102} Juror Kennedy informed the court that on the previous evening, she was playing in a softball game for her employer's team. One of the players, whose name she did not know, approached her and asked, "Are you on jury duty?" Kennedy replied, "Yes, but I'm not allowed to discuss it." He said, "Oh, okay," and "put his hands like he understood and * * * backed away." He said nothing more to Kennedy for the rest of the game. Kennedy later learned that Tim Gangway was the person who approached her and that Gangway's wife and Kennedy worked for the same employer. Tim is the brother of Bill Gangway, the victim's boyfriend.

{¶ 103} Kennedy said that she is not close to Tim or his wife. Kennedy stated that she did not feel intimidated, threatened, or uncomfortable because of this conversation. She added that this experience did not compromise her ability to be a fair and impartial juror.

{¶ 104} Tim's version of the events echoed Kennedy's. Tim told the court that he had approached Kennedy after his wife told him that one of her co-workers might be on Frazier's jury. Tim talked to Kennedy because he was concerned that she might see the name "Gangway" on the back of his jersey and make some connection with his brother, who was scheduled to testify in the case. Tim said he approached Kennedy, explaining, "I didn't want it to cause any problems in the future." After finishing his explanation, the trial court admonished Tim not to have any kind of contact with the jurors, and he was excused.

{¶ 105} The trial court stated that Tim "was trying to do the right thing." The state and trial counsel agreed, both noting, "We're good." The trial court declared the matter resolved, and the trial continued.

{¶ 106} In cases involving outside influences on jurors, trial courts are granted "broad discretion" in dealing with the contact and determining whether to declare a mistrial or to replace the affected juror. *State v. Phillips* (1995), 74 Ohio St.3d 72, 89, 656 N.E.2d 643. A trial court is permitted to rely on a juror's testimony in determining that juror's impartiality. *State v. Herring* (2002), 94 Ohio St.3d 246, 259, 762 N.E.2d 940. Moreover, issues concerning the weight given to the evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

{¶ 107} Frazier argues that the trial court should have dismissed juror Kennedy and replaced her with an alternate because she might have had other conversations with Bill Gangway, Tim Gangway, or Tim's wife during the trial. Frazier also claims that no one knows the true impact of Tim's conversation on juror Kennedy. However, trial counsel expressed satisfaction with juror Kennedy's answers and did not challenge her. Thus, in the absence of plain error, this claim is waived. See *State v. Childs* (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus.

{¶ 108} We find no plain error. Frazier's claim that Kennedy might have had additional contact with Tim, his wife, or Bill Gangway is totally speculative. Nothing in the record supports this claim. Moreover, juror Kennedy said that she was not affected by Tim's contact, and the trial court could rely on her assurances.

{¶ 109} Frazier's alternative argument claiming that his counsel were ineffective by failing to challenge Kennedy also has no merit. Reversal of a conviction for ineffective assistance of counsel requires that the defendant show, first, that

counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. Here, trial counsel were not deficient because nothing was said during Tim's brief conversation with Kennedy that would support a defense challenge. Based on the foregoing, proposition VI is rejected.

{¶ 110} *Failure to file motions to suppress.* In proposition of law V, Frazier argues that his counsel were ineffective by failing to file a motion to suppress his pretrial statements and a motion to suppress evidence seized from his apartment.

{¶ 111} *1. Frazier's pretrial statement.* Detective William Seymour testified that Frazier was advised of his *Miranda* rights prior to making a statement. Frazier waived his *Miranda* rights orally and in writing and agreed to provide a statement. The advisement and waiver of Frazier's *Miranda* rights were also videotaped. According to Detective Seymour, Frazier appeared to be clearheaded and did not appear to be under the influence of alcohol or drugs.

{¶ 112} A court, in determining whether a pretrial statement is involuntary, " 'should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.' " *State v. Mason* (1998), 82 Ohio St.3d 144, 154, 694 N.E.2d 932, quoting *State v. Edwards* (1976) 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus.

{¶ 113} Frazier claims that his statements were involuntary because of his low intelligence. However, mental deficiency is but one factor in the totality of circumstances to be considered in determining the voluntariness of a confession. A defendant's mental condition may be a "significant factor in the 'voluntariness' calculus. * * * But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.' " *Colorado v. Connelly* (1986), 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473. See *State v. Lynch,* 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 55–57.

{¶ 114} Frazier has failed to demonstrate that his counsel were ineffective by failing to file a motion to suppress his pretrial statement because of his mental deficiencies. First, there is no evidence of police coercion or overreaching rendering Frazier's statement involuntary. Absent such evidence, counsel had no basis to request suppression of Frazier's statements.

{¶ 115} Second, there is no evidence that Frazier was incapable of making a voluntary statement. Frazier was found competent to stand trial. In his evaluation, Dr. Gregory Forgac, a clinical psychologist, reported, "Frazier did

surprisingly well in responding to my questions. He was able to converse with me appropriately and he appeared capable of understanding the nature and objectives of the proceedings which have been brought against him." In a subsequent evaluation, Dr. Forgac determined that Frazier was not mentally retarded and that his intellectual functioning was within the upper range of borderline intellectual functioning.

{¶ 116} Frazier's behavior during the police interview also belies his claim that his pretrial statements were involuntary because of his low intelligence. His videotaped statements show that Frazier comprehended the investigators' questions, and he was able to express his thoughts and recall his actions in a rational manner.

{¶ 117} Moreover, trial counsel appear to have made a tactical decision not to challenge Frazier's statement because the introduction of Frazier's statement allowed the jury to hear Frazier's proclamations of innocence. In his statements, Frazier persistently denied any sexual contact with the victim, denied taking any of her property, and denied any responsibility for her death. The introduction of Frazier's statements meant that counsel had the benefit of having Frazier's exculpatory explanation of events in evidence, without the risk of having Frazier take the stand in his own defense and subject himself to cross-examination. See *State v. Adams,* 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 32–34 (not contesting a voluntary and exculpatory pretrial statement is a matter of trial strategy and is not ineffective assistance).

{¶ 118} Frazier argues that the prosecutor's concern about Frazier's low intelligence should have alerted trial counsel to file a motion to suppress. This argument also has no merit. During a pretrial hearing, Frazier's trial counsel, Mark Berling, mentioned that Frazier's "limited abilities in abstract thinking" hindered defense efforts to reach a plea agreement with the state. In response, the prosecutor stated, *"[B]ased upon what Mark's saying,* I have an ongoing concern that his client may not be able to knowingly, intelligently and voluntarily enter into a plea." The prosecutor's concerns were based on trial counsel's description of Frazier's mental problems. The prosecutor's comments did not alert the defense to any new information about Frazier's mental deficiencies that should have led them to file a motion to suppress.

{¶ 119} *2. Search of Frazier's apartment.* On March 4, 2004, investigators executed a search warrant for Frazier's apartment. The police seized two white T-shirts that were the same size and brand as the bloody T-shirt found in the trash.

{¶ 120} Frazier argues that his counsel were ineffective by failing to file a motion to suppress the search warrant because of his mental deficiencies. Nothing in the record suggests that the search warrant was defective, and

Frazier presents no evidence that his mental deficiencies had any bearing on the issuance of the search warrant. Based on the foregoing, we overrule proposition V.

{¶ 121} *Sealing the prosecutor's file.* In proposition of law XI, Frazier argues that the trial court erred by refusing the defense request to have the prosecutor's file sealed for appellate review.

{¶ 122} The defense filed a pretrial motion requesting that a complete copy of the prosecutor's file be made, turned over to the trial court to review, and sealed for appellate review. The defense argued this was necessary to ensure the complete disclosure of exculpatory and impeachment evidence, as required by *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. The trial court denied this motion.

{¶ 123} The trial court was not required to examine or seal the prosecutor's file based on speculation that the prosecutor *might* have withheld exculpatory evidence. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 64; *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 60. The prosecutor provided the defense with open-file discovery and was fully aware of his continuing obligation to divulge exculpatory evidence. Thus, we reject proposition XI.

{¶ 124} *Expert qualifications.* In proposition of law XVI, Frazier claims that the trial court erred by allowing Brian Bowen to testify about DNA test results without determining that he was qualified to testify as an expert.

{¶ 125} At trial, Bowen testified that DNA testing identified Stevenson's DNA on the knife blade and the bloody T-shirt recovered from the trash. Bowen also identified Frazier's DNA on the T-shirt. While the state never formally tendered Bowen as an expert, trial counsel never objected to his testimony or challenged his qualifications. Thus, Frazier waived all but plain error. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 112.

{¶ 126} No plain error occurred. Bowen, a forensic scientist, testified that he had worked at the DNA serology unit at BCI for approximately five years. Bowen holds a bachelor's degree in biology from Wittenberg University and a master's degree in immunology from Ohio State University. He is also a member of the American Academy of Forensic Sciences and the Midwestern Association of Forensic Scientists. Bowen maintains his qualifications by taking biannual proficiency tests in DNA. He testified that he has analyzed thousands of DNA samples during his career.

{¶ 127} Under Evid.R. 702(B), Bowen "qualified as an expert by specialized knowledge, skill, experience, training, or education" to testify as a forensic scientist about DNA test procedures and DNA test results. Based on his

qualifications, the state's failure to tender him as an expert was of no legal consequence. See *State v. Hartman* (2001), 93 Ohio St.3d 274, 285–286, 754 N.E.2d 1150. Thus, we overrule proposition XVI.

{¶ 128} In proposition of law XVII, Frazier argues that his counsel were ineffective by failing to object to Bowen's DNA testimony because he was not qualified as an expert witness. However, his counsel were not deficient by failing to object, because Bowen was qualified to testify as an expert in DNA analysis. Moreover, by not challenging Bowen's qualifications, trial counsel avoided inviting the prosecutor to ask questions that might bolster Bowen's qualifications in the eyes of the jury. See *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 51. Given the strong presumption that counsel's performance constituted reasonable assistance, we conclude that trial counsel's actions may have been tactical decisions, and we reject this claim of ineffectiveness. See *State v. Bradley*, 42 Ohio St.3d at 144, 538 N.E.2d 373. Proposition XVII is overruled.

{¶ 129} *Rape evidence.* In proposition of law VII, Frazier argues that the trial court erred by permitting evidence that the victim suffered vaginal injuries and a bruised cervix because he was not charged with rape or any other sexual offenses. He also contends that the prosecutor committed misconduct during his closing argument by arguing that the victim was raped.

{¶ 130} Count one in the indictment alleged that Frazier "did purposely cause the death of another while committing or attempting to commit * * * kidnapping, *rape*, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary, or escape." (Emphasis added.) In a motion in limine, the defense sought to prohibit the introduction at trial of "any evidence of alleged sexual activity and/or conduct of defendant." During a pretrial hearing on this motion, the prosecutor informed the court that "rape is one of the theories underlying the aggravated murder."

{¶ 131} During the state's case-in-chief, Detective Schriefer testified that at the crime scene, the victim's nightgown was tucked into her underpants. Dr. Beisser testified that during the victim's autopsy, abrasions and lacerations were found on the vagina, and bruising was found on the cervix. Dr. Beisser stated that the vaginal trauma was consistent with vaginal intercourse, but she could not determine whether the victim had been raped. DNA test results were also introduced identifying Frazier as the source of a pubic hair found on the victim's arm.

{¶ 132} During the state's guilt-phase closing argument, the prosecutor argued that vaginal injuries, trauma to the cervix, and the presence of Frazier's pubic hair on the victim's arm showed that Frazier had raped Stevenson. The

prosecutor also argued that sex was one of Frazier's motives for breaking into Stevenson's apartment and attacking her.

{¶ 133} After its motion in limine, the defense did not renew its objections at trial to the introduction of evidence of rape or the prosecutor's closing argument about rape and thus waived all but plain error. See *Gable v. Gates Mills,* 103 Ohio St.3d 449, 2004-Ohio-5719, 816 N.E.2d 1049, ¶ 34 ("a ruling on a motion in limine may not be appealed and * * * objections * * * must be made during the trial to preserve evidentiary rulings for appellate review").

{¶ 134} Frazier claims that evidence of rape was evidence of another crime that was not admissible under Evid.R. 404(B). Under Evid.R. 404(B), "[e]vidence of *other crimes, wrongs, or acts* is not admissible to prove" a defendant's character as to criminal propensity. (Emphasis added.) Frazier's argument can be rejected because evidence of rape is not evidence of another crime, but proof of one of the underlying felonies for the felony-murder charge. Thus, the state was entitled to present police and expert testimony showing that Stevenson was raped at the time of her murder. Moreover, even if rape had not been charged as one of the underlying felonies, rape evidence would be admissible under Evid.R. 404(B) to prove Frazier's possible motive for committing the murder. See *State v. Brinkley,* 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 34.

{¶ 135} Frazier's claim that the prosecutor committed misconduct during his closing argument by arguing that Frazier raped Stevenson is also rejected. A prosecutor is "entitled to latitude as to what the evidence has shown and what inferences can reasonably be drawn from the evidence." *State v. Smith* (1997), 80 Ohio St.3d 89, 111, 684 N.E.2d 668. Thus, the prosecutor committed no plain error in arguing that the evidence showed that Frazier had murdered Stevenson while committing or attempting to commit rape.

{¶ 136} Finally, we reject the defense argument that rape evidence improperly prejudiced Frazier during the penalty phase. First, the trial court excluded photographs of vaginal trauma before the start of the penalty phase. Second, the prosecutor made no reference to rape evidence during his penalty-phase closing argument. Finally, the trial court's instructions on the aggravating circumstances correctly identified aggravated murder committed during an aggravated robbery and aggravated murder committed during an aggravated burglary as the only two aggravating circumstances for the jury to consider during its penalty-phase deliberations.

{¶ 137} Based on the foregoing, we reject proposition VII.

{¶ 138} *Defendant's absence.* In proposition of law XVIII, Frazier argues that the trial court's failure to secure his presence or obtain a waiver of his presence at various in-chambers discussions and legal conferences violated his constitutional rights to confrontation and due process.

{¶ 139} An accused has a fundamental right to be present at all critical stages of his criminal trial. Section 10, Article I, Ohio Constitution; Crim.R. 43(A). An accused's absence, however, does not necessarily result in prejudicial or constitutional error. "[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, *and to that extent only.*" (Emphasis added.) *Snyder v. Massachusetts* (1934), 291 U.S. 97, 107–108, 54 S.Ct. 330, 78 L.Ed. 674.

{¶ 140} In *United States v. Gagnon* (1985), 470 U.S. 522, 527, 105 S.Ct. 1482, 84 L.Ed.2d 486, the Supreme Court held that under certain circumstances, a defendant's absence from a hearing at which his counsel are present does not offend due process. In *Kentucky v. Stincer* (1987), 482 U.S. 730, 746, 107 S.Ct. 2658, 96 L.Ed.2d 631, the court found no due process or Confrontation Clause violation when an accused was excluded from a hearing on the competency of two child witnesses. See, e.g., *State v. Williams* (1983), 6 Ohio St.3d 281, 285–286, 6 OBR 345, 452 N.E.2d 1323 (absence at hearings can be harmless error).

{¶ 141} First, Frazier complains about his absence during in-chambers discussions among the court, defense counsel, and the state on March 16, 2004, and January 26, 2005. However, the record does not affirmatively establish Frazier's absence. *State v. Clark* (1988), 38 Ohio St.3d 252, 258, 527 N.E.2d 844 ("the record must affirmatively indicate the absence of a defendant or his counsel during a particular stage of the trial"). Thus, this complaint lacks merit.

{¶ 142} Second, Frazier complains about his absence during an in-chambers discussion on March 17, 2005. During this session, counsel discussed motions that needed to be argued and decided that day. During a subsequent pretrial hearing, the defense counsel waived Frazier's presence on March 17. Even though the waiver was after the fact, counsel could have waived Frazier's presence during these in-chambers discussions. See, e.g., *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 122. Moreover, Frazier suffered no prejudice, because his absence occurred during a discussion involving legal or scheduling issues within the professional competence of counsel. See *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 215; see, also, *United States v. Brown* (C.A.6, 1978), 571 F.2d 980, 987 (accused must establish prejudice from absence at in-chambers conference).

{¶ 143} Third, Frazier argues that his absence during an in-chambers discussion on April 27, 2005, violated his right to be present. However, the record shows that Frazier was present at these proceedings.

{¶ 144} Fourth, Frazier complains about his absence during an in-chambers conference on May 3, 2005. During this conference, the parties discussed the status of pretrial negotiations and scheduling issues. Frazier was in open court and did not object when the defense counsel waived Frazier's presence at the in-

chambers conference. Thus, Frazier's presence was properly waived. See *United States v. Gagnon*, 470 U.S. at 528, 105 S.Ct. 1482, 84 L.Ed.2d 486 (trial court "need not get an express 'on the record' waiver from the defendant for every trial conference which a defendant may have a right to attend"); *United States v. Gallego* (C.A.2, 1999), 191 F.3d 156, 171 (waiver can be implied by accused's failure to object to exclusion).

{¶ 145} Fifth, Frazier objects to his absence during an in-chambers conference on May 11, 2005. During this conference, counsel for both sides talked with the judge about jury selection and excuses and the defendant's clothing at trial. The record does not show that Frazier's presence at the in-chambers conference was waived. Nevertheless, Frazier's absence was not prejudicial because the jury received neither testimony nor evidence, and no critical stage of the trial was involved.

{¶ 146} Sixth, Frazier argues that his absence during two off-the-record bench conferences violated his right to be present. However, no prejudice occurred because of the absence of evidence about the discussions during those bench conferences. See *State v. Tyler* (1990), 50 Ohio St.3d 24, 38, 553 N.E.2d 576.

{¶ 147} Seventh, Frazier objects to his absence during a conference on jury instructions. Trial counsel waived Frazier's presence at this conference. Moreover, Frazier's absence during the hearing on proposed jury instructions did not deprive him of a fair trial. *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 52.

{¶ 148} Finally, Frazier claims that his absence when a jury question was asked during deliberations constituted prejudicial error. During jury deliberations, the jury returned to the courtroom and asked whether a written copy of the coroner's report was submitted into evidence. Trial counsel waived Frazier's presence because "[h]e was brought over and there was some difficulty in getting him in the mood to get dressed for Court * * *." Because counsel waived the defendant's presence, Frazier's claim lacks merit. Moreover, Frazier invited the error that he now complains about because his own behavior caused his absence from court. See *Hal Artz Lincoln–Mercury, Inc. v. Ford Motor Co.* (1986), 28 Ohio St.3d 20, 28 OBR 83, 502 N.E.2d 590, paragraph one of the syllabus (a "party will not be permitted to take advantage of an error which he himself invited or induced").

{¶ 149} Based on the foregoing, we overrule proposition XVIII.

### Penalty–Phase Issues

{¶ 150} *Mental retardation.* In proposition of law IV, Frazier asserts that he cannot be executed because he is mentally retarded. In the alternative, Frazier

argues that his counsel were ineffective by failing to present and preserve evidence of his mental retardation.

{¶ 151} In a pretrial motion, trial counsel requested that Frazier be examined to determine whether he is mentally retarded. On April 22, 2005, Frazier was evaluated by Dr. Gregory Forgac at the Court Diagnostic and Treatment Center in Toledo. Dr. Forgac administered the Wechsler Adult Intelligence Scale–Third Edition ("WAIS–III") test, which showed that Frazier had a verbal IQ of 81, a performance IQ of 73, and a full-scale IQ of 75. Dr. Forgac determined that Frazier is not mentally retarded.

{¶ 152} In a pretrial hearing on May 3, 2005, trial counsel withdrew the claim that Frazier is mentally retarded. The defense withdrawal was based on Dr. Forgac's report and trial counsel's "lengthy discussions with him and * * * Dr. Smalldon, who had initially seen Mr. Frazier."

{¶ 153} During mitigation, Dr. Jeffrey Smalldon, a clinical psychologist, testified that Frazier "was not mentally retarded." Dr. Smalldon also administered the WAIS–III test, which showed that Frazier has a "verbal IQ estimate of 77, a performance or non-verbal IQ estimate of 72, and a full scale IQ estimate of 72."

{¶ 154} In *Atkins v. Virginia* (2002), 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335, the United States Supreme Court held that executing a mentally retarded person violates the Eighth Amendment's proscription against cruel and unusual punishment. In advancing an *Atkins* claim, the defendant bears the burden of proving by a preponderance of the evidence that he or she (1) suffers from "significantly subaverage intellectual functioning," (2) experienced "significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction," and (3) manifested "onset before the age of 18." *State v. Lott,* 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, ¶ 12. *Lott* also held that "there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70." Id.

{¶ 155} The state argues that Frazier waived this claim because the defense withdrew its *Atkins* motion at trial. We have not previously decided whether a capital defendant can waive an *Atkins* claim. However, a constitutional right can be waived in criminal cases by the failure to make timely assertion of it. *Peretz v. United States* (1991), 501 U.S. 923, 936–937, 111 S.Ct. 2661, 115 L.Ed.2d 808. Moreover, other jurisdictions have held that the failure to raise an *Atkins* claim results in waiver. *Bowling v. Commonwealth* (Ky.2005), 163 S.W.3d 361, 371; *Winston v. Commonwealth* (2004), 268 Va. 564, 617, 604 S.E.2d 21; *Head v. Hill* (2003), 277 Ga. 255, 259, 587 S.E.2d 613. Absent plain error, Frazier has waived his *Atkins* claim.

{¶ 156} Here, there is no error, plain or otherwise. After conducting comprehensive evaluations and administering a full battery of tests, Dr. Forgac and Dr.

Smalldon determined that Frazier is not mentally retarded. Moreover, the results of two IQ tests showed that Frazier's IQ was above 70. Thus, Frazier has failed to meet his burden of proof to show that he is mentally retarded, as *Atkins* requires.

{¶ 157} Frazier argues that his IQ score of 72 has a margin of error of plus or minus five points, and so the score places him within the borderline mentally retarded range. Dr. Smalldon acknowledged that IQ tests have "some wiggle room that goes about five points either way." However, Dr. Smalldon stated, "[B]ased on everything that I've learned about Mr. Frazier, I believe that those numbers [the IQ test results] are pretty good numbers, that those are pretty accurate numbers." Moreover, Dr. Forgac reported a "95% confidence level" that Frazier's IQ test results were accurate within a range of a 71 IQ and 80 IQ. See *In re Bowling* (C.A.6, 2005), 422 F.3d 434, 437; *United States v. Roane* (C.A.4, 2004), 378 F.3d 382, 409, quoting *United States v. Tipton* (May 1, 2003), E.D.Va. No. 3: 92CR68 (the psychologist's care in calculating an IQ score " 'belies the suggestion that [the psychologist's] analysis did not account for possible variations in his testing instrument' "). Thus, we reject Frazier's claim for a downward adjustment of his IQ score to within the borderline mentally retarded range.

{¶ 158} Second, Frazier claims that he is mentally retarded because he was awarded Social Security benefits in 1994 based on a diagnosis that he is mentally retarded. However, Frazier has presented neither the IQ test score nor the criteria that the Social Security officials used in making this diagnosis. See *State v. Waddy*, Franklin App. No. 05AP–866, 2006-Ohio-2828, 2006 WL 1530117, ¶ 41 (distinguishing diagnosis of mental retardation made for purposes of receiving Social Security benefits from an *Atkins* claim).

{¶ 159} Finally, Frazier argues that he lived in subsidized housing for the elderly and disabled at the time of the murder, a circumstance revealing significant limitations in his adaptive skills. Frazier also contends that his poor grades in school, erratic employment history, failed marriage, and other poor relationships provide evidence of his limitations in adaptive skills. However, Frazier provides no support for these claims. Moreover, neither Dr. Forgac nor Dr. Smalldon found that Frazier has " 'significant limitations in adaptive functioning in at least two * * * skill areas,' " as *Atkins* requires. *Atkins*, 536 U.S. at 309, 122 S.Ct. 2242, 153 L.Ed.2d 335, fn. 3, quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th Ed.2000) 41.

{¶ 160} Based on the foregoing, we overrule Frazier's mental-retardation claim.

{¶ 161} We also reject Frazier's argument that his counsel provided ineffective assistance by failing to present evidence that he is mentally retarded. See *Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 162} First, Frazier's argument that his counsel were ineffective in withdrawing his mental-retardation claim because his IQ score of 72 had a margin of error of five points lacks merit. As previously discussed, Dr. Smalldon testified that Frazier's IQ score of 72 is a "pretty accurate" score.

{¶ 163} Second, Frazier's contention that his counsel failed to properly present evidence that he received Social Security benefits based on a diagnosis of mental retardation is also meritless. Frazier presented no evidence linking the criteria used for the Social Security diagnosis and his *Atkins* claim. Moreover, trial counsel's decision not to present the Social Security diagnosis represented a tactical decision because Dr. Smalldon and Dr. Forgac had found that Frazier is not mentally retarded.

{¶ 164} Third, we conclude that Frazier's counsel were not ineffective by failing to request a penalty-phase instruction about what the defense terms Frazier's "status as a mentally retarded individual." His counsel were not deficient, because no evidence was presented during mitigation that Frazier is mentally retarded.

{¶ 165} Fourth, we reject Frazier's assertion that his counsel were ineffective by failing to consult with him before withdrawing the mental-retardation claim. During a hearing on May 9, 2005, Frazier told the trial court that he understood his counsel's reasons for withdrawing his motion for a court's determination of mental retardation. Frazier stated, "I know what we're talking about and everything, I understand what he's saying, IQ and so forth and so on, yes." Frazier also said, "I don't have a problem with" the withdrawal of the motion.

{¶ 166} Finally, Frazier contends that his counsel were ineffective by failing to obtain the opinion from a mental-retardation expert, other than Dr. Smalldon and Dr. Forgac, before withdrawing the mental-retardation claim. Dr. Smalldon and Dr. Forgac are clinical psychologists who examined Frazier and determined that he is not mentally retarded. Frazier asserts that Dr. Smalldon and Dr. Forgac were not qualified to render an adequate opinion about mental retardation because they are not mental-retardation experts.

{¶ 167} Dr. Smalldon and Dr. Forgac were both fully qualified to render an opinion that Frazier is not mentally retarded. We note that Dr. Smalldon, the defense's own expert, has presented testimony about mental retardation in numerous capital cases. See *State v. Elmore,* 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 157–158; *State v. Ketterer,* 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 224; *State v. Thomas,* 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 118. Thus, we find that counsel were not ineffective by failing to

request the opinion of a third expert before withdrawing the mental-retardation claim.

{¶ 168} Based on the foregoing, we overrule proposition IV.

{¶ 169} ***Prosecutorial misconduct.*** In proposition of law X, Frazier argues that the prosecutor committed misconduct by arguing that Frazier should receive the death penalty even though the prosecutor had expressed concern about Frazier's mental capacity to enter a plea. However, trial counsel failed to object to the comments he now complains of and waived all but plain error. *State v. Slagle* (1992), 65 Ohio St.3d 597, 604, 605 N.E.2d 916.

{¶ 170} The test for prosecutorial misconduct during closing argument is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. To determine prejudice, the record must be reviewed in its entirety. *State v. Lott* (1990), 51 Ohio St.3d 160, 166, 555 N.E.2d 293.

{¶ 171} During a pretrial hearing on May 3, 2005, trial counsel stated that the defense was trying to negotiate a plea bargain. Counsel continued, "Mr. Frazier * * * has very limited abilities in abstract thinking, * * * and if we are going to reach a successful plea agreement, * * * I'm going to need to be able to offer him something concrete other than the death penalty." Counsel added, "I can't * * * [present him] with a range of options because he doesn't get the range of options. He will never understand that." Trial counsel conceded that Frazier had never expressed an interest in entering a guilty plea.

{¶ 172} In response, the prosecutor stated, "But if we have somebody who can't plead or won't plead, there aren't very many options left to me." The prosecutor also said, "Well, *based upon what [defense counsel] Mark's saying,* I have an ongoing concern that his client may not be able to knowingly, intelligently and voluntarily enter in to a plea." (Emphasis added.) Ultimately, pretrial negotiations were not successful.

{¶ 173} During the penalty-phase rebuttal argument, the prosecutor argued:

{¶ 174} "What else do we have? He's one short step above mental retardation. He is. Probably the most critical question I asked Dr. Smalldon this morning was, What's the relationship between his IQ and committing [a] death penalty murder offense? And Dr. Smalldon answered honestly, there is no correlation. Some coldblooded killers have IQs of 120, some have IQs of 72 or 74.

{¶ 175} "What's the point I'm making here? He still had the ability to make other choices throughout his long life, and he chose not to make them."

{¶ 176} Frazier contends that the prosecutor's remarks about Frazier's ability to make choices constituted misconduct because the prosecutor knew that Frazier

was unable to make a complex decision. However, the prosecutor's argument was not error, plain or otherwise.

{¶ 177} The prosecutor's rebuttal comments responded to earlier defense arguments suggesting that Frazier's behavior was not a matter of choice. During final argument, defense counsel emphasized that Frazier is "a short step above mental retardation," a crack cocaine addict, and an abuse victim. Trial counsel argued that Frazier "didn't have the tools to begin with * * * [and] it's extremely difficult, especially when you have these limited tools, * * * to break this cycle. And once that monster has its hands on you, you're going to be a monster and something like this is going to happen."

{¶ 178} The prosecutor's rebuttal simply pointed out the lack of correlation between Frazier's low IQ and the victim's murder. Thus, the prosecutor's rebuttal argument represented fair comment.

{¶ 179} Moreover, the prosecutor's pretrial concern about Frazier's ability to enter a plea did not bar the prosecutor from making this rebuttal argument. The prosecutor's pretrial comments were made in the context of *defense assertions* that Frazier was having problems understanding his plea options. However, Frazier was found competent to stand trial, and he is not mentally retarded. Thus, the prosecutor's earlier concerns about Frazier's abilities did not prevent the prosecutor from making this rebuttal argument. We reject proposition X.

{¶ 180} In proposition of law XIII, Frazier argues that the prosecutor committed misconduct during his penalty-phase closing rebuttal argument. However, the defense failed to object to the prosecutor's remarks and waived all but plain error. *State v. Slagle*, 65 Ohio St.3d at 604, 605 N.E.2d 916.

{¶ 181} First, Frazier argues that the prosecutor's rebuttal argument improperly treated the nature and circumstances of the offense as an aggravating factor. Frazier complains about the following comments:

{¶ 182} "Let's look at the other nature and circumstances of this offense. Let's talk about the victim for a second. He chose somebody who was more helpless than him. Sure he didn't bring the knife with him, but he brought his hands and he used those hands on her neck until she was this close to being dead and then he cut her throat. This is predatory behavior. That fits in with the lack of remorse, the failure to take responsibility for what he did, the efforts to throw off the police and all the lies he's told about this case. There's very little weight, due to the nature and circumstances of this offense, that go on the mitigation side of the scale."

{¶ 183} Although "prosecutors cannot argue that the nature and circumstances of an offense are aggravating circumstances, the facts and circumstances of the offense must be examined to determine whether they are mitigating. R.C.

2929.04(B). Thus, a prosecutor may legitimately refer to the nature and circumstances of the offense, both to refute any suggestion that they are mitigating and to explain why the specified aggravating circumstance[s] outweigh mitigating factors." *State v. Sheppard* (1998), 84 Ohio St.3d 230, 238, 703 N.E.2d 286.

{¶ 184} The prosecutor did not characterize any of the facts of the offense as aggravating circumstances. Rather, the prosecutor refuted trial counsel's argument suggesting that the nature and circumstances of the offense had mitigating aspects. Trial counsel had argued that Frazier "didn't go down there [i.e., to the victim's room] with his own knife. He didn't go down there attempting to inflict any harm at all." In response, the prosecutor pointed out that Frazier did not bring a knife to the victim's apartment because he strangled her. Thus, the prosecutor properly argued that the nature and circumstances of the offense were not mitigating. See *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 178–179. Second, Frazier contends that the prosecutor committed misconduct by urging the jurors to reach a unanimous verdict. During his closing rebuttal argument, the prosecutor stated:

{¶ 185} "If you all go back there and just vote individual opinions, we haven't accomplished anything through the course of this trial. You need to go back there and talk about the weight of things and agree among the 12 of you what they weigh, and when you do that, ultimately we've reached the right verdict here."

{¶ 186} Frazier argues that the prosecutor's argument undermined the trial court's instructions that a solitary juror may prevent a death-penalty recommendation. While the prosecutor's comments were not precise, isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning. *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431. This argument was not improper because the prosecutor was simply urging the jurors to deliberate before voting.

{¶ 187} Moreover, the trial court accurately instructed the jurors on the weighing process. The court also instructed the jurors that "[o]ne juror may prevent a death penalty determination by finding that the aggravating circumstances do not outweigh the mitigating factors." Cf. *State v. Brooks* (1996), 75 Ohio St.3d 148, 160–162, 661 N.E.2d 1030. Thus, we find no plain error.

{¶ 188} For the foregoing reasons, we overrule proposition XIII.

{¶ 189} *Instructions.* In proposition of law I, Frazier argues that errors in the penalty-phase jury instructions violated his rights and require a new penalty hearing. However, except where noted, the defense failed to object and waived all but plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus.

{¶ 190} First, Frazier argues that the trial court erred by refusing the defense request to instruct the jury to consider mercy in its deliberations. However, Frazier was not entitled to an instruction on mercy. *State v. Garner* (1995), 74 Ohio St.3d 49, 57, 656 N.E.2d 623; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 417, 613 N.E.2d 212.

{¶ 191} Second, Frazier asserts that the trial court erred by failing to instruct the jury to consider each aggravating circumstance separately. Frazier was convicted on one murder count and two attached aggravating circumstances. During penalty-phase instructions, the trial court instructed the jury to weigh the two aggravating circumstances (murder during an aggravated robbery and murder during an aggravated burglary) against the mitigating factors. Contrary to Frazier's assertion, "[a]ggravating circumstances in a single count are considered collectively in assessing the penalty for that count, and a defendant is sentenced only on individual criminal counts, not on specifications of aggravating circumstances." *State v. Hessler* (2000), 90 Ohio St.3d 108, 126, 734 N.E.2d 1237. Thus, no plain error was committed in giving these instructions.

{¶ 192} Third, without citation to authority, Frazier claims that the trial court should have instructed that the state has to prove that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt. This argument has no merit because the trial court's instruction on the burden of proof followed the language in R.C. 2929.03(D)(1) and (D)(2). See *State v. Jackson,* 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 100.

{¶ 193} Fourth, Frazier asserts that the trial court erred in instructing the jury that "[m]itigating factors are factors that lessen the moral culpability of the defendant * * *." Mitigation is not about blame or culpability, but rather about punishment. See *State v. Holloway* (1988), 38 Ohio St.3d 239, 527 N.E.2d 831, paragraph one of the syllabus. Nevertheless, the overall penalty-phase instructions informed the jury that the issue was punishment, not culpability. See *State v. Bey* (1999), 85 Ohio St.3d 487, 498, 709 N.E.2d 484.

{¶ 194} Finally, Frazier claims that the trial court erred by failing to instruct the jury that Frazier must prove the mitigating factors by a preponderance of the evidence. See *State v. Jenkins* (1984), 15 Ohio St.3d 164, 171–172, 15 OBR 311, 473 N.E.2d 264.

{¶ 195} In a pretrial motion, the defense requested (1) an order relieving it of the burden of proving the mitigating factors and (2) an instruction that the state bears the burden of proving the absence of any mitigating factors offered by the

defense. This motion was denied. However, trial counsel did not preserve this motion by raising it during trial.

{¶ 196} Frazier argues that the trial court's failure to instruct on the burden of proof for mitigating factors may have caused the jury to believe that the mitigating factors must be proven beyond a reasonable doubt. However, the trial court instructed the jury that the "defendant does not have the burden of proof," an instruction more favorable to Frazier than the absent instruction. See *State v. Hicks* (1989), 43 Ohio St.3d 72, 78, 538 N.E.2d 1030. We find no plain error. Based on the foregoing, we reject proposition I.

{¶ 197} *Noncapital sentencing.* In proposition of law VIII, Frazier argues that he is entitled to a new penalty-phase hearing because the trial court imposed consecutive sentences in violation of *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470.

{¶ 198} On May 9, 2005, the trial court sentenced Frazier to eight years for aggravated robbery in Count 2, and eight years for aggravated burglary in Count 3. The trial court ordered that the sentences for aggravated robbery and aggravated burglary be served concurrently with each other and consecutively to the aggravated murder count.

{¶ 199} In imposing consecutive sentences, the trial court stated:

{¶ 200} "[T]he Court find[s] that consecutive sentences [are] necessary to fulfill the purpose of 2929.11 of the Ohio Revised Code, and specifically in making that finding, the Court finds that it is necessary to protect the public from future crime and it is not disproportionate to the seriousness of the defendant's conduct and not disproportionate to the danger the offender poses to the public.

{¶ 201} "Specifically, the Court finds that in the commission of these offenses the defendant caused the death of another, Miss Mary Stevenson, a very vulnerable woman and handicapped woman * * *, and that it was a very senseless act. And the Court also finds that the harm was so great and unusual that no single prison term can adequately reflect the seriousness of the offender's conduct, and the Court again specifically refers to the findings relative to the specifications and the aggravating factors in those specifications, that being that the commission of these offenses resulted in the brutal murder of * * * Mary Stevenson."

{¶ 202} On June 24, 2004, more than ten months before Frazier's sentencing, the Supreme Court had decided *Blakely v. Washington* (2004), 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403. *Blakely* held that the Sixth Amendment prohibits a judge from imposing a sentence greater than that allowed by a jury verdict or by the defendant's admissions at a plea hearing. Id. at 305–306, 124 S.Ct. 2531, 159

L.Ed.2d 403. However, trial counsel did not object that Frazier's noncapital sentences were imposed in violation of *Blakely*.

{¶ 203} On February 27, 2006, in *Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, we applied *Apprendi v. New Jersey* (2000), 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435, and *Blakely* to Ohio's noncapital sentencing statutes. *Foster* at paragraphs one and three of the syllabus. *Foster* held that portions of R.C. 2929.14(C), which requires judicial fact-finding for maximum prison terms, and R.C. 2929.14(E)(4), which requires judicial findings for consecutive terms, are unconstitutional under *Blakely*. *Foster*, paragraph three of the syllabus. *Foster* also held that these unconstitutional statutory provisions are severable and that judicial fact-finding is no longer required before the imposition of maximum sentences or consecutive prison terms. Id., paragraphs two and four of the syllabus.

{¶ 204} In the present case, the trial court's fact-finding in support of consecutive sentences violated *Foster* because a jury did not make findings on the seriousness of the offense justifying consecutive sentences.

{¶ 205} Nevertheless, there is a question as to whether Frazier's failure to object to his noncapital sentences constitutes waiver. Frazier was sentenced after *Blakely* but before this court's decision in *Foster*. In *Foster*, we rejected waiver on the ground that *Blakely* had not been decided at the time of Foster's sentencing: "Foster could not have relinquished his sentencing objections as a known right when no one could have predicted that *Blakely* would extend the *Apprendi* doctrine to redefine 'statutory maximum.'" *Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, ¶ 31. We recently resolved this issue in *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, and we therefore conclude that defense counsel's failure to challenge Frazier's noncapital sentencing waived his present claim.

{¶ 206} A waived claim will still be considered when there is plain error. However, the test for plain error is stringent. A party claiming plain error must show that (1) an error occurred, (2) the error was obvious, and (3) the error affected the outcome of the trial. See *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240; *United States v. Olano* (1993), 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508; Crim.R. 52(B); see, also, *Washington v. Recuenco* (2006), 548 U.S. ——, 126 S.Ct. 2546, 2553, 165 L.Ed.2d 466 (*Blakely* error is not a "structural error" and is subject to harmless-error analysis).

{¶ 207} The burden of demonstrating plain error is on the party asserting it. See, e.g., *State v. Jester* (1987), 32 Ohio St.3d 147, 150, 512 N.E.2d 962 ("appellant cannot claim that the trial court's instruction was plain error, inasmuch as he cannot demonstrate that but for the error, the outcome of the trial would have been different"). Additionally, "[n]otice of plain error * * * is to be taken with

the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus.

{¶ 208} We hold that the consecutive sentences imposed on Frazier did not result in plain error. After *Foster*, "trial courts * * * are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." *Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, ¶ 100. Nothing in the record suggests that the noncapital sentencing would have been different if Frazier had been sentenced in accordance with *Blakely* and *Foster*. Indeed, there is no way to know whether the trial court would have imposed consecutive sentences had he sentenced Frazier consistently with *Blakely* and *Foster*.

{¶ 209} Based on the foregoing, we reject proposition VIII.

{¶ 210} ***Postverdict discussions with jury.*** In proposition of law XIV, Frazier contends that the trial judge erred in conducting an off-the-record ex parte discussion with the jurors after the jury had returned its penalty-phase verdict but before the trial court had imposed sentence.

{¶ 211} After the jury's penalty-phase verdict was announced, the trial court acknowledged the jury's hard work on the case. The trial judge announced, "[W]e'll be in recess now," and added, "I'll come back and talk with you for a couple of minutes."

{¶ 212} Frazier's claim lacks merit. First, trial counsel were present, but did not object, when the trial judge mentioned that she would speak to the jurors. By making no complaint, the defense waived any objection. See *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 153.

{¶ 213} Second, Frazier has failed to establish prejudice from any conversations that the trial court may have had with the jury. Moreover, Frazier has not attempted to reconstruct what the trial court discussed with the jury in an effort to show prejudice. See App.R. 9(B) and (E); *State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 98.

{¶ 214} Finally, as in *Williams*, "when the judge and jury met, the jurors had satisfied their official task and were free to discuss the case." Id. at ¶ 99. Also, the trial court can be presumed to consider " 'only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary.' " *State v. Post* (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754, quoting *State v. White* (1968), 15 Ohio St.2d 146, 151, 44 O.O.2d 132, 239 N.E.2d 65. Thus, we reject proposition XIV.

### Ineffective Assistance of Counsel

{¶ 215} In proposition of law, XII, Frazier raises various claims that his trial counsel provided ineffective assistance and that a new trial is warranted. See *Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 216} **1. Lack of pretrial preparation.** Frazier argues that his counsel provided ineffective assistance by failing to review and object to surveillance footage. The state provided the defense with CD–ROMs (compact discs, read-only memory) showing 350 hours of footage from 16 surveillance cameras at Northgate Apartments. The defense also received a compilation CD–ROM showing relevant footage of Frazier's and other individuals' movements around the time of the murder.

{¶ 217} During an out-of-court hearing on May 12, 2005, trial counsel expressed concern about the fairness of the compilation CD–ROM. The trial court ruled that the compilation CD would be admitted. Trial counsel also mentioned that the defense lacked the proper equipment to open the CD–ROMs. Later that day, the state loaned the defense a laptop computer to review the CD–ROMs.

{¶ 218} On May 16, 2005, the compilation CD–ROM was shown, without objection, to the jury. Toledo policeman Randal Navarro and Detective William Seymour provided the foundation for introducing the compilation CD–ROM into evidence. Detective Seymour also provided narrative testimony explaining events shown on the CD–ROM.

{¶ 219} First, Frazier argues that his counsel failed to review the surveillance footage from the CD–ROMs. However, Frazier presents no evidence showing that his counsel did not review the surveillance footage. It cannot be assumed that counsel did not review the footage just because four days elapsed between the date that the defense received equipment to open the CD–ROMs and the date when the surveillance footage was shown in court.

{¶ 220} Second, Frazier argues that his counsel provided ineffective assistance by not cross-examining Navarro and by conducting only a brief cross-examination of Seymour. Frazier fails to state the questions that his counsel should have asked these witnesses. Moreover, whether further questioning would have unearthed any useful information is speculative. We find that counsel's decision to forgo cross-examination constituted a legitimate tactical decision. See *State v. Foust,* 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 125.

{¶ 221} **2. Inadequate voir dire.** Frazier argues that his counsel provided ineffective assistance by failing to ask any follow-up questions of six prospective jurors who stated that they could not impose the death penalty. However, "[t]he conduct of voir dire by defense counsel does not have to take a particular form,

nor do specific questions have to be asked." *State v. Evans* (1992), 63 Ohio St.3d 231, 247, 586 N.E.2d 1042. Moreover, "counsel is in the best position to determine whether any potential juror should be questioned and to what extent." *State v. Murphy* (2001), 91 Ohio St.3d 516, 539, 747 N.E.2d 765.

{¶ 222} The six prospective jurors expressed strong views opposing the death penalty. Contrary to Frazier's claims, trial counsel did ask venireman Piel whether she "could or could not sign a death verdict," and she replied, "Could not." The remaining five jurors indicated to the court that "under no circumstances" would they be willing or able to follow the instructions and consider the death penalty. Trial counsel were not deficient by failing to ask follow-up questions of these jurors after they had expressed intractable views opposing the death penalty. See *State v. Phillips* (1995), 74 Ohio St.3d 72, 85, 656 N.E.2d 643.

{¶ 223} **3. Trial counsel's comments.** Frazier argues that trial counsel made various comments during both phases of the trial that resulted in ineffective assistance.

{¶ 224} Before trial, counsel responded, "You mean besides enter a plea? Which is what I would prefer," to the trial court's question about any further pretrial issues in the case. Frazier claims that this response showed that his counsel were not putting forth a full effort in his defense. Frazier's complaint takes these comments out of context. The defense had tried to negotiate a pretrial agreement before the trial began. If counsel's negotiations had been successful, Frazier would not have received the death penalty. Counsel's remarks reflected no unwillingness to continue actively defending Frazier after these negotiations failed. Counsel's isolated remarks do not show deficient performance and were not prejudicial. See *State v. Drummond,* 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 214.

{¶ 225} Second, Frazier complains that his counsel provided ineffective assistance during the guilt-phase closing argument by conceding that the crime was "horrible" and that the victim "was a wonderful person. And she had no reason to die, and she was murdered in a fashion most foul." Trial counsel's statements do not reflect deficient performance. Counsel's candid acknowledgement that a horrible murder was committed on a defenseless victim helped to build rapport with the jury. Indeed, it is difficult to discuss this crime without using such words. See *State v. Campbell* (2000), 90 Ohio St.3d 320, 337, 738 N.E.2d 1178.

{¶ 226} Third, Frazier argues that his counsel provided ineffective assistance during the penalty-phase opening statement by commenting on the horrible nature of the crime committed on an innocent and defenseless victim. He also claims that his counsel was ineffective by stating:

{¶ 227} "I'd like to harken back to the statements I made at the conclusion of the first phase and that is, we worked real hard to get a jury in this case, one

whose verdict we could trust, and that's what we got. That's exactly what we got. And I heard the evidence too. I mean, I worked on the case for 14 months. And we got a sound verdict."

{¶ 228} Counsel's acceptance of the jury's guilt-phase verdict helped trial counsel maintain rapport with the jury as the defense moved into the penalty phase. See *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 151–152. There was nothing counsel could do to change the jury's finding of guilt. Counsel merely noted that the jury had already convicted his client and that counsel was then moving beyond that fact to focus the jury's attention on mitigating factors. Such argument represented a legitimate tactical decision. See *State v. Hartman* (2001), 93 Ohio St.3d 274, 296, 754 N.E.2d 1150 (counsel not ineffective for conceding blame during the penalty-phase closing argument).

{¶ 229} Finally, Frazier argues that his counsel provided ineffective assistance during the penalty-phase closing argument by stating:

{¶ 230} "But relative to the nature and circumstances of the offense, * * * this was a gruesome crime. They don't get much more gruesome than that. When you physically lay your [h]ands on another human being in the act of strangulation, take their life, that puts you right up to the top, a consideration for imposition of the death penalty."

{¶ 231} Frazier's claim that trial counsel's argument improperly conveyed to the jury that the gruesome nature of the crime could be considered an aggravating circumstance misconstrues the purpose of this argument. Trial counsel acknowledged that the crime was gruesome; however, he then emphasized that Frazier never intended to kill Stevenson when he went to her apartment. Thus, trial counsel's remarks focused on highlighting the mitigating features (e.g., no intent to kill) of Frazier's actions. We find that this argument was a tactical decision and did not constitute ineffective assistance. *State v. Bradley*, 42 Ohio St.3d at 144, 538 N.E.2d 373.

{¶ 232} **4. Failure to ensure a complete record**. Frazier claims that his counsel provided ineffective assistance by failing to object to unrecorded bench conferences and an unrecorded jury-instruction conference. However, Frazier cannot show prejudice because there is no evidence about what happened during these conferences. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 220. "Acts or omissions by trial counsel which cannot be shown to have been prejudicial may not be characterized as ineffective assistance." *State v. Davie* (1997), 80 Ohio St.3d 311, 332, 686 N.E.2d 245.

{¶ 233} **5. Alcohol- and drug-abuse expert**. Frazier argues that his counsel provided ineffective assistance by failing to retain a substance-abuse expert to present testimony about his history of alcohol and drugs, particularly crack cocaine. This claim has no merit. Dr. Jeffrey Smalldon testified as a mitigation

witness, and his written evaluation was also introduced into evidence. Dr. Smalldon diagnosed Frazier with a "history of alcohol abuse and a history of polysubstance abuse." Dr. Smalldon testified that Frazier was drinking 15 to 20 beers a day in his mid-thirties. In the mid–1990s, Frazier went through a detoxification program to treat his cocaine abuse. Thus, Dr. Smalldon found that "there's a pretty solid foundation for inferring a history of both significant alcohol abuse and significant substance abuse." Accordingly, the defense presented " 'alternative devices that * * * fulfill the same functions as the expert assistance sought.' " *State v. Foust,* 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 103, quoting *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph four of the syllabus.

{¶ 234} **6. Failure to request change of venue.** Frazier argues that his counsel provided ineffective assistance by failing to move for a change of venue. The record does show the pervasive publicity about which Frazier complains. Counsel could also reasonably decide as a matter of trial strategy to conduct the trial in Toledo instead of requesting a change of venue. See *State v. Bryan,* 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 156 (reviewing court "will not second-guess trial strategy decisions").

{¶ 235} Moreover, a change of venue is not automatically granted when there is extensive pretrial publicity. Any decision to change venue rests largely within the discretion of the trial court. *State v. Maurer* (1984), 15 Ohio St.3d 239, 250, 15 OBR 379, 473 N.E.2d 768. "[A] careful and searching voir dire provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality." *State v. Bayless* (1976), 48 Ohio St.2d 73, 98, 2 O.O.3d 249, 357 N.E.2d 1035. Also, a "defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased." *State v. Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 29.

{¶ 236} Here, the trial court questioned the jurors about pretrial publicity. Nine of the seated jurors had not been exposed to any media coverage about the case. One juror had heard Frazier's name in the news, and another juror had seen TV news reports about the case. Both jurors indicated that pretrial publicity would not have any effect on their ability to be fair and impartial. The remaining juror saw a headline about the case in the paper; however, she was not asked whether it would influence her. Nevertheless, this juror said, "I would have to know the circumstances of the case, which I don't know anything" before reaching a verdict. We find that this claim also lacks merit.

{¶ 237} **7. Other allegations of ineffective assistance of counsel.** Frazier raises other instances of alleged ineffective assistance of counsel, but none of these prejudiced him. *Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. 2052,

80 L.Ed.2d 674. As previously discussed in other propositions, Frazier's counsel were not ineffective by failing to object because Bowen was not qualified as an expert witness (XVII), and his counsel were not ineffective by failing to file motions to suppress (V). Frazier was also not prejudiced by trial counsel's failure to secure Frazier's waiver of his presence at in-chambers discussions and legal conferences (XVIII) or by his counsel's failure to obtain an expert in mental retardation and more fully develop Frazier's mental status (IV). Finally he was not prejudiced by his counsel's failure to object to the state's penalty-phase argument (XIII) or by his counsel's failure to object to penalty-phase instructions (I).

{¶ 238} For the foregoing reasons, we reject proposition XII.

{¶ 239} In proposition of law XXI, Frazier claims that his counsel failed to preserve meritorious issues, but Frazier never cites any record reference or any specific meritorious issues that counsel failed to preserve. Thus, Frazier fails to establish deficient performance or prejudice. Moreover, we find nothing in the record showing any meritorious issues that were not preserved. Proposition XXI is overruled.

{¶ 240} In proposition of law XXII, Frazier asserts that his counsel were ineffective by failing to adequately preserve the record for appellate review. As discussed in proposition XII, Frazier cannot show prejudice because he fails to establish what transpired during unrecorded in-chambers discussions and legal conferences. Thus, we deny proposition XXII.

## Cumulative Errors

{¶ 241} In proposition of law XX, Frazier argues that cumulative errors deprived him of a fair trial and require a reversal of his convictions and death sentence. However, Frazier received a fair trial. Moreover, "errors cannot become prejudicial by sheer weight of numbers." *State v. Hill* (1996), 75 Ohio St.3d 195, 212, 661 N.E.2d 1068. Thus, we reject proposition XX.

## Settled Issues

{¶ 242} *Reasonable doubt.* In proposition of law IX, Frazier challenges the constitutionality of the instructions on reasonable doubt. However, we have repeatedly affirmed the constitutionality of R.C. 2901.05(D). See *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 232, 594 N.E.2d 604. Thus, proposition IX is denied.

{¶ 243} *Constitutionality.* In proposition of law XV, Frazier attacks the constitutionality of Ohio's death-penalty statutes. We summarily reject these claims. See *State v. Carter* (2000), 89 Ohio St.3d 593, 607, 734 N.E.2d 345; *State*

*v. Jenkins,* 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph one of the syllabus.

{¶ 244} Frazier also contends that Ohio's death-penalty statutes violate international law and treaties to which the United States is a party. These arguments also lack merit. See *State v. Bey,* 85 Ohio St.3d at 502, 709 N.E.2d 484.

{¶ 245} In proposition of law XVII, Frazier challenges the constitutionality of lethal injection. We have previously rejected similar claims. See *State v. Adams,* 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 131; *State v. Carter,* 89 Ohio St.3d at 608, 734 N.E.2d 345.

### Sufficiency and Weight of the Aggravating Circumstances

{¶ 246} In proposition of law XXIII, Frazier argues that his death penalty must be vacated because the aggravating circumstances do not outweigh the mitigating factors. We shall address this argument during our independent sentence evaluation.

### Proportionality

{¶ 247} In proposition of law XXIV, Frazier claims that his death sentence is disproportionate to death sentences imposed in similar cases. This argument will also be addressed during our independent sentence evaluation.

## INDEPENDENT SENTENCE EVALUATION

{¶ 248} Having considered Frazier's propositions of law, we are required by R.C. 2929.05(A) to independently review Frazier's death sentence for appropriateness and proportionality. The evidence at trial established beyond a reasonable doubt that Frazier murdered Mary Stevenson while committing or attempting to commit aggravated robbery, R.C. 2929.04(A)(7), and while committing or attempting to commit aggravated burglary, R.C. 2929.04(A)(7).

{¶ 249} Against these aggravating circumstances, we are called upon to weigh the mitigating factors contained in R.C. 2929.04(B). Frazier called one mitigating witness, Dr. Smalldon, and introduced his written report, the coroner's verdict, and Dr. Forgac's written report, and he submitted other documentary evidence for the jury's consideration. Frazier presented neither a sworn nor unsworn statement.

{¶ 250} Dr. Smalldon evaluated and conducted psychological testing of Frazier. Dr. Smalldon also reviewed Frazier's records, interviewed Frazier's brother, reviewed statements from other family members, and talked to Gary Ericson, the defense's mitigation specialist, about Frazier's background.

{¶ 251} As discussed in proposition IV, Frazier's IQ tests show that he has a verbal IQ of 77, a performance IQ of 72, and a full scale IQ of 72. Dr. Smalldon

testified that Frazier's IQ scores place him "toward the lower end of the borderline range of intelligence." Dr. Smalldon also stated that Frazier's IQ scores are consistent with his failure in first grade, his designation as a slow learner in school, and Frazier's attendance in special classes before he dropped out of school after the tenth grade.

{¶ 252} Dr. Smalldon diagnosed Frazier with "a depressive disorder not otherwise specified." According to Dr. Smalldon, Frazier's records show that he has had "episodic fluctuating symptoms of depression over a period of many years." Frazier was also diagnosed with a history of alcohol and polysubstance abuse, including marijuana and cocaine. Finally, Dr. Smalldon diagnosed Frazier with "a personality disorder not otherwise specified" and "borderline intellectual functioning."

{¶ 253} According to Dr. Smalldon, Frazier was the "product of a very unstable family." He was one of six children. Social service workers reported that Frazier and his siblings "were just kind of running around unsupervised, not responsive to parental direction." Frazier's family was also very poor. Records showed that the family was living on a weekly wage of $64.

{¶ 254} Frazier's father was absent and uninvolved with his children. He was also a gambler and a drinker. Frazier described his father as the "main disciplinarian" and said, "When you got a whooping, you got a whooping." Frazier remembered that on one occasion, "his father crash[ed] through the bathroom door * * * to administer one of those."

{¶ 255} Frazier described himself as feeling ashamed as an elementary school student and said that other students would tease him and call him stupid. Frazier was not active in school activities because he lacked money for "clothes and stuff like that." Frazier was an overall D student, and he dropped out of high school when he was 19 years old.

{¶ 256} Frazier told Dr. Smalldon that when he was 13 or 14 years old, a man abducted him while he was getting off a bus and sodomized him. Frazier stated, "I've never forgotten it. Fifty years later, those images are with me today." Dr. Smalldon testified that Frazier's trust in other people "evaporated after that experience."

{¶ 257} When Frazier was 25 years old, he married Tommie Louise Washington, but they divorced several years later. Frazier dated several other women after his divorce and fathered three illegitimate children. According to Dr. Smalldon, "none of these relationships had a great deal of staying power, and even when he was involved in them, * * * [there was] quite a bit of turmoil."

{¶ 258} Frazier's employment history has been erratic, and he seldom remained employed for very long. Moreover, most of his employment involved

"unskilled or very marginally-skilled jobs." Frazier described himself as an unreliable employee. He said, "I'd get fired because I drink." In 1994, Frazier was granted Social Security disability based on an administrative finding that he was mentally retarded.

{¶ 259} Frazier has a history of significant alcohol and substance abuse. Frazier's medical records in the mid–1990s show that he was drinking "20 bottles of beer a day, along with using drugs." His medical records also show that he was hospitalized in the mid–1990s for suicidal and homicidal ideation. Frazier was depressed because he had broken up with his girlfriend, and he was thinking of hurting himself and killing her.

{¶ 260} Dr. Smalldon testified that Frazier never expressed remorse about Stevenson's murder because he said "he didn't do it." Dr. Smalldon also reported Frazier to be "a very compliant, easy-to-handle inmate" during the 15 months that he was in the county jail. Dr. Smalldon stated that if he were treating Frazier, "the very first thing that [he] would look to is structure, [a] highly-controlled environment like a prison." Beyond that, Dr. Smalldon stated that he would not "expect to make any major progress in terms of changing [Frazier's] personality structure." Rather, he would look at "behavioral kinds of interventions."

{¶ 261} As discussed in proposition IV, Dr. Forgac found that Frazier is not mentally retarded. Dr. Forgac diagnosed Frazier with "borderline intellectual functioning." When Dr. Forgac asked Frazier whether he hears voices, he replied, "All the time, even when I'm sitting here sometimes. Men's voices, not clear, like interference, but mostly when I get ready to go to sleep." Frazier also indicated that he was "[w]atched all the time" where he lives. However, Dr. Forgac concluded, "There was nothing in this man's clinical presentation, including his thought content or stream of thought, which would indicate he was acutely psychotic on the day of this evaluation."

{¶ 262} We find nothing in the nature and circumstances of the offense to be mitigating. Frazier entered Stevenson's apartment and murdered her by strangling her and slitting her throat. Afterwards, Frazier stole two of her purses and fled the scene. These facts establish a horrific crime without any mitigating features.

{¶ 263} Although Frazier's character offers nothing in mitigation, we give some weight to his history and background. Frazier was raised in an unstable family environment with little parental direction and control. Frazier did poorly in school and dropped out of high school. Frazier claims that when he was a teenager, he was sexually abused by a man. If that is true, Frazier was undoubtedly traumatized by this experience.

{¶ 264} Frazier also had a long history of drug and alcohol abuse. Testimony at trial showed that Frazier was drinking and using crack cocaine on the night before he murdered Stevenson.

{¶ 265} The statutory mitigating features are generally inapplicable here, including R.C. 2929.04(B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), (B)(4) (youth of the offender), (B)(5) (lack of a significant criminal record), and (B)(6) (accomplice only).

{¶ 266} Frazier's mental deficiencies do not qualify as an R.C. 2929.04(B)(3) factor because there was no testimony that Frazier, by reason of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

{¶ 267} Nevertheless, Frazier's limited intellectual abilities are entitled to significant weight in mitigation under the catchall provision of R.C. 2929.04(B)(7). Dr. Smalldon testified that Frazier has an IQ of 72, which places him in the borderline range of intelligence. However, the evidence at trial did not establish that he is mentally retarded. Thus, his execution is not barred by *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335.

{¶ 268} In proposition of law XXIII, Frazier argues that he should not receive the death penalty because he is elderly (he was 63 at the time of the offenses) and not a "fit candidate" for the death penalty. Frazier argues that any life sentence will keep him in prison for the rest of his life. However, Frazier's age had no effect on his ability to brutally murder Stevenson. Thus, we give little weight to his age as a mitigating factor. The evidence does not reveal any other mitigating factors under R.C. 2929.04(B)(7).

{¶ 269} We find that the aggravating circumstances outweigh the mitigating factors, beyond a reasonable doubt. Frazier murdered Stevenson during the course of an aggravated robbery and an aggravated burglary. Compared with these serious aggravating circumstances, Frazier's mitigating evidence has little significance.

{¶ 270} Finally, the death penalty imposed for the aggravated murder of Stevenson is proportionate to death sentences approved for other robbery-murder and burglary-murder cases. See *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 168; *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 124; *State v. Jones* (2000), 90 Ohio St.3d 403, 423, 739 N.E.2d 300; and *State v. Stallings* (2000), 89 Ohio St.3d 280, 301, 731 N.E.2d 159.

Judgment affirmed.

MOYER, C.J., PFEIFER, O'CONNOR, O'DONNELL, LANZINGER and CUPP, JJ., concur.

Julia R. Bates, Lucas County Prosecuting Attorney, and David F. Cooper and Eric A. Baum, Assistant Prosecuting Attorneys, for appellee.

Spiros P. Cocoves and Ann M. Baronas, for appellant.