DECISION AND JUDGMENT
{¶ 1} This is an appeal from a judgment of the Lucas County Court of Common Pleas, in which the trial court denied a motion for postconviction relief filed by appellant, James Frazier, pursuant to R.C. 2953.21. On appeal, appellant sets forth the following two assignments of error: *Page 2 
 {¶ 2} "First Assignment of Error
 {¶ 3} "The trial court erred in dismissing appellant's post-conviction petition finding none of the grounds for relief to warrant granting relief when he presented sufficient operative facts to merit relief or, at minimum, an evidentiary hearing.
 {¶ 4} "Second Assignment of Error
 {¶ 5} "The trial court erred by denying all of appellant's requests for discovery."
 {¶ 6} The facts of this case are fully set forth by the Ohio Supreme Court State v. Frazier, 115 Ohio St.3d 139, 2007-Ohio-5048. Accordingly, we will repeat herein only those facts that are necessary to determine the issues before us on appeal.
 {¶ 7} On the evening of March 1, 2004, and into the morning of March 2, 2004, appellant and several acquaintances were in appellant's unit at the Northgate apartment complex in Toledo, drinking alcohol and smoking crack cocaine. At some point appellant, who was wearing a white T-shirt, left the apartment for a period of time. When appellant later returned to the apartment, he was not wearing a shirt. At 7:17 a.m. on March 2, appellant telephoned 911 to report a woman lying on the floor of the laundry room. When paramedics arrived at the apartment complex, there was no woman on the laundry-room floor.
 {¶ 8} At approximately 9 a.m. on March 2, Bill Gangway arrived at Northgate to visit his girlfriend, Mary Stevenson. When Mary, who suffered from cerebral palsy, did not answer her door, Gangway went to visit a friend in another apartment. When Stevenson did not answer the door several hours later, Gangway contacted the apartment *Page 3 
manager, who opened the door to the apartment and found Stevenson lying on the bedroom floor in a pool of blood. Her throat had been slit, and her nightgown was tucked into the front of her underpants. There was no sign of either forced entry or a struggle, and no murder weapon was found in the apartment; however, a knife was missing from a holder in the kitchen.
 {¶ 9} On March 3, 2004, police searched the apartment dumpster, where they found two purses belonging to Stevenson, along with her birth certificate, Medicare card, bank card, and library card. Also, several bills addressed to appellant were in the dumpster, along with a white T-shirt, size XXL, which was turned inside out. The missing knife from Stevenson's kitchen, which appeared to have blood on it, was also found. The white T-shirt and the knife tested positive for human blood. Samples from the knife and the shirt were sent away for DNA testing.
 {¶ 10} Based on the evidence found in the dumpster, police suspected that appellant may have been involved in Stevenson's murder. On March 4, 2004, police searched appellant's apartment, where they found two more white T-shirts, size XXL, with the same manufacturer's tags as the shirt in the dumpster. Appellant was taken to the police station for questioning.
 {¶ 11} At 2 p.m. and 9:45 p.m. on March 4, police detectives conducted videotaped interviews of appellant. After being advised of and waiving his Miranda rights, appellant told the detectives that he went to the laundry room after 6 a.m. on March 2, where he saw a woman on the floor. He then knocked on Stevenson's door. *Page 4 
Stevenson let him into the apartment to call 911. However, when police arrived several minutes later, the woman was gone from the laundry room. Appellant told the detectives that Stevenson was alive when he left her apartment. In the second interview, appellant admitted taking a bundle of laundry to the laundry room. He also stated that "nothing happened out of the ordinary" in Stevenson's apartment. He admitted throwing the white T-shirt in the dumpster; however, he denied attacking Stevenson or throwing away any of her possessions.
 {¶ 12} Surveillance cameras at Northgate showed a female resident in the laundry room at 6:30 a.m. and appellant in the hallway, looking into the laundry room, at 7:16 a.m. They also showed appellant returning to the laundry room at 7:24 a.m. and again at 7:25 a.m., before he got on the elevator to the third floor. Appellant exited the elevator at 7:25 a.m., without the bundle of laundry. At 7:26 a.m., he peeked into the laundry room, then disappeared. He reappeared with paramedics several seconds later. In all of the surveillance videos, appellant was wearing a white T-shirt.
 {¶ 13} On March 4, 2004, appellant was indicted by the Lucas County Grand Jury on one count of aggravated robbery pursuant to R.C. 2911.01(A)(3), one count of aggravated burglary pursuant to R.C. 2911.11(A)(1), and one count of aggravated murder pursuant to R.C. 2903.01(B). The aggravated murder count carried with it death penalty specifications pursuant to R.C. 2929.04(A)(7).
 {¶ 14} Initially, appellant's appointed counsel claimed that appellant was mentally retarded and therefore not eligible for the death penalty. At defense counsel's request, *Page 5 
appellant was referred to the Court Diagnostic and Treatment Center for an evaluation of his competency to stand trial, pursuant to R.C. 2945.371(G)(3). The examination was performed by Gregory E. Forgac, Ph.D., a clinical psychologist, who found that appellant was not mentally retarded and was otherwise competent to stand trial. Defense counsel asked the court for a second determination as to whether appellant was mentally retarded, pursuant to Atkins v. Virginia (2002),536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335, and State v. Lott,97 Ohio St.3d 303, 2002-Ohio-6625. The trial court approved the request, and appellant was further evaluated by Jeffrey Smalldon, Ph.D., who determined, after meeting with appellant twice and subjecting him to a battery of tests, that appellant was not mentally retarded. Based on Forgac's and Smalldon's opinions, defense counsel withdrew their claim that appellant was not death-penalty eligible due to mental retardation.
 {¶ 15} At trial, testimony was presented as to the nature of Stevenson's injuries, the presence of DNA that was consistent with that of appellant on the white T-shirt, and the presence of Stevenson's blood on the knife and the T-shirt. Genetic test results were also presented that showed appellant could not be excluded as the donor of a hair found on Stevenson's body. The jury also heard testimony as to appellant's whereabouts at the time of Stevenson's murder, based on the video surveillance recordings and testimony from witnesses that were in appellant's apartment, and that appellant was using crack cocaine the night before Stevenson's murder took place. At the conclusion of all the testimony, the jury found appellant guilty as charged in the indictment. *Page 6 
 {¶ 16} On May 20, 2005, the sentencing phase of the trial began at which Smalldon testified that he was retained by the defense, with the court's permission, to evaluate whether appellant was mentally retarded. To that end, Smalldon conducted two interviews with appellant, reviewed Forgac's report and information obtained through a background investigation, and administered a battery of tests to appellant. Smalldon determined that appellant has an IQ of 72, which places him just above mild mental retardation, on the low end of "borderline" for normal intelligence. Smalldon stated that appellant's IQ score is consistent with his reported history, which includes failing the first grade, being labeled as a "slow learner" in school, and taking special education classes in high school before dropping out in the tenth grade. Smalldon also testified that appellant has deficits in at least two adaptive functions, defined as day-to-day activities, such as obtaining transportation, cooking, management of money, and self care.
 {¶ 17} As a clinical diagnosis, Smalldon stated that appellant has depressive disorder not otherwise specified, which is characterized by inadequacy, insecurity, a history of alcohol and polysubstance abuse (marijuana and cocaine), and a personality disorder not otherwise specified, which is characterized by antisocial, narcissistic, and passive-aggressive behavior. Smalldon further stated that appellant had an "unstable" home life as a child, where he received inconsistent parental supervision and lived in a non-nurturing environment. Smalldon testified that a "cluster of themes" was pervasive across appellant's life, including loss, abandonment, betrayal, separation, distrust, a lack of closeness to his siblings, and a lack of friends. Smalldon said that appellant and his *Page 7 
five siblings were not responsive to parental direction, and were "just kind of running around unsupervised." In addition, appellant told Smalldon he was sexually abused by a stranger at the age of 13.
 {¶ 18} Smalldon testified that appellant differs from other capital defendants, in that he was 64 years old when the crime was committed, and he displayed a formal and respectful, but somewhat distant, attitude during the interviews with Smalldon. Smalldon also testified that appellant "says a lot" but his speech is "shallow" and does not have much content. Smalldon stated that appellant fathered three children by two different mothers; however, he was never married to either of the two women, and he does not have a close relationship with any of his adult children.
 {¶ 19} Smalldon stated that appellant's personality disorders may be a combination of "biology and learning," and that he may be "hard wired" for such difficulties. However, Smalldon stated that environmental influence definitely played a part; particularly appellant's use of crack cocaine. Smalldon testified that he is not a "medical doctor" and thus is not qualified to explain in-depth the physiological effects of drug abuse; however, as a forensic psychologist, he is familiar with the behavioral effects of "acute crack cocaine intoxication." According to Smalldon, those effects can include unpredictable and erratic behavior, hyper-arousal, agitation, irritability, not sleeping for days, "tunnel vision," short-term euphoria, and an inability to think of anything other than crack cocaine. *Page 8 
 {¶ 20} When asked to elaborate on his comments, Smalldon stated "I wouldn't want to go too far down the road of saying I'm acquainted with the physiology of addiction. That would be beyond my expertise." However, Smalldon said that, after being awake for three days as a result of using crack cocaine, the body wears down, even though the drug creates hyper-arousal. In such a state, the drug user may hallucinate, and have feelings of intensified desperation to obtain the drug.
 {¶ 21} As to appellant's general demeanor, Smalldon testified that appellant was ashamed of being a slow learner in school. Smalldon also testified that appellant was unable to play sports in school because his parents did not have the money to buy appellant and his five siblings clothes and things like sports equipment on their household income of $64 per week. Smalldon further testified that appellant described his father as a drinker and a gambler who sometimes fought with appellant's mother and disciplined the children with physical punishment.
 {¶ 22} On cross-examination, Smalldon testified that, by the time appellant was in the fourth grade, he was described by school teachers as "not well adjusted" and "below average." Smalldon stated that, in 1951, appellant's home was evaluated by a social worker in response to a report that appellant and his brother were stealing. The social worker reported evidence of poor housekeeping, lack of teamwork between appellant's parents, and inadequate supervision of the six children.
 {¶ 23} Smalldon stated that appellant was married for a few years; however, the marriage did not produce children and ultimately ended in divorce. In 1994, appellant *Page 9 
was admitted to a hospital by his brother, John, after appellant threatened to harm his then-girlfriend, and attempted to commit suicide. Smalldon further stated that, in 1998, the Social Security Administration awarded appellant disability benefits, after finding that he was "mentally retarded" and suffering from a "slight degree of limitation" in his daily activities. However, Smalldon did not know the criteria on which that determination was based. Smalldon stated that, after interviewing appellant, he believed appellant lacked empathy and had an element of "grandiosity" in his personality. He further described appellant as irresponsible and impulsive.
 {¶ 24} Smalldon testified that, in his opinion, appellant shares many personality traits with psychopaths, including a lack of personal relationships, poor work history, and a narcissistic personality. Smalldon further testified that appellant probably would not respond to treatment; however, he could be "managed" in a structured environment, like prison. When asked if appellant could ever be cured, Smalldon responded: "I wouldn't look for a cure to James Frazier."
 {¶ 25} On redirect, Smalldon stated that appellant has only been successful in life when incarcerated, where he is seen as a "mature" inmate. Smalldon stated that, although he was hired by the defense, he was unable to conclude that appellant is mentally retarded. He could, however, state that appellant had parents who were unable to provide him with a good home environment, he had siblings of less than average intelligence, and he was less than an average student in high school. Smalldon also stated that is common for people with low mentality, like appellant, to be manipulative and unable to form *Page 10 
long-lasting relationships. Smalldon opined that appellant's race may have prevented his family from receiving adequate government services in the 1950s. He summarized appellant's position in life as the "bottom of the heap."
 {¶ 26} No other mitigation witnesses were called to testify at the mitigation hearing, and appellant did not make a statement on his own behalf. After reviewing the evidence, the jury found that the aggravating circumstances outweighed the mitigating factors and recommended that appellant be sentenced to death. The trial court agreed and entered judgment in conformity with the jury's recommendation.
 {¶ 27} Appellant filed a direct appeal to the Ohio Supreme Court, in which he raised 24 assignments of error, all of which were found to be without merit. See State v. Frazier, 115 Ohio St.3d 139, supra. In addition, the Ohio Supreme Court performed an independent reweighing of the evidence in the mitigation phase of the trial, and determined that "the aggravating circumstances outweigh the mitigating factors, beyond a reasonable doubt." Id., ¶ 269. Accordingly, appellant's convictions and sentence were upheld. Id.[1]
 {¶ 28} On May 15, 2006, appellant filed a petition to vacate or set aside his sentence in the trial court, pursuant to R.C. 2953.21, along with affidavits and other documentary evidence. In his petition, appellant listed nine propositions of law, in which he asserted that he was denied his rights under the Ohio and United States Constitutions. *Page 11 
In his first claim for relief, appellant asserted that he should not be given the death penalty because he is mentally retarded. In his second, third, fourth, sixth, and seventh claims, appellant asserted respectively that he was denied effective assistance of appointed defense counsel because counsel failed to ensure that that he received a complete mental retardation evaluation in order to prepare for the mitigation phase of the trial; present crucial mitigating evidence concerning his background to the jury; retain and present testimony by a substance abuse expert in mitigation; acquire and present in mitigation available statistical data concerning the application of the death penalty in Lucas County, Ohio; and raise an equal protection claim based on appellant's race. In his fifth ground for relief, appellant asserted that the death penalty by lethal injection constitutes cruel and unusual punishment. In his eighth ground for relief, appellant asserted that Ohio's postconviction relief procedures are inadequate. In his ninth ground for relief, appellant asserted that the cumulative effect of errors and omissions presented in his petition are prejudicial and have denied appellant his constitutional rights.
 {¶ 29} Appellant supported his petition with exhibits. The first exhibit was the affidavit and report of Timothy Rheinscheld, Ph.D., a licensed clinical psychologist, who reviewed and evaluated trial testimony, medical records and other materials relating to appellant. Based on his review, which included Smalldon's test results, report and trial testimony, Rheinscheld disagreed with Smalldon's conclusion that appellant is not mentally retarded, because appellant met all of the three recognized criteria used by the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition — Text Revision *Page 12 
(DSM IV-TR), used to determine mental retardation. Rheinscheld stated that tests administered by Smalldon placed appellant's IQ at 72, which is within the standard deviation of + or — 5 points for those test instruments, and allows for a possible IQ of less than 70. Rheinscheld also stated, based on appellant's school records, that appellant's mental disability manifested in both elementary and high school, and he had significant limitations in adaptive functions in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, work, leisure, use of community resources, self-direction, functional academic skills, health, and safety.
 {¶ 30} The second exhibit is Smalldon's psychological evaluation, performed at the request of defense counsel, in which Smalldon stated that appellant's "intelligence falls somewhere in the `borderline' range." Smalldon also concluded, based on his interviews with the appellant and review of appellant's records, that appellant would have no more difficulty adjusting to long-term incarceration than any other inmate.
 {¶ 31} Appellant's third exhibit was Forgac's report in which Forgac also concluded, after interviewing appellant for two hours and administering several psychological tests, that appellant is not mentally retarded. Appellant's fourth exhibit was a letter from Carol Mrozek, Public Affairs Specialist for the Social Security Administration, to Gary Ericson, investigator for appellant's defense counsel. Mrozek stated in the letter that, based on the determination that appellant is mentally retarded, he was receiving $564 per month. The letter also recounted appellant's sporadic *Page 13 
employment history from 1978 through 1999, and stated that appellant had no verifiable employment from 2000 through 2003.
 {¶ 32} The fifth, sixth and seventh exhibits were affidavits by appellant's siblings, Nathaniel, John and Jean Frazier. In his affidavit, John Frazier stated that he also lives at Northgate apartments, and knows that appellant is "well-liked by the residents" of the building. However, even though he and appellant lived in the same apartment building, John "did not see James on a daily basis, nor understand everything that was going on in his life." John also stated that, if he had been asked, he would have testified at the trial on his brother's behalf.
 {¶ 33} In her affidavit, Jean Frazier stated that appellant was not a "troublemaker" as a child. Jean further stated that she would describe her childhood relationship with appellant as "close," however, as the two got older they did not "visit each other all that often." Jean also stated that, although she was willing to testify at appellant's trial, she was never asked to do so.
 {¶ 34} Nathaniel Frazier, appellant's youngest brother, stated in his affidavit that he did not know why appellant did not finish high school and could not maintain steady employment. Nathaniel also stated that he did not have much contact with James as an adult, other than "except at times provide him with transportation" and sometimes give him money for rent. However, Nathaniel stated that he would have been willing to testify at the trial, if necessary. *Page 14 
 {¶ 35} The eighth exhibit was the affidavit and report of Robert L. Smith, Ph.D., a clinical psychologist with a specialty in substance abuse and addiction. In his report Smith reviewed at length the process of making crack cocaine and the physiological effects cocaine use has on the human brain and body. Smith concluded, after reviewing appellant's medical and social history and the trial transcripts, that appellant was using crack cocaine on the night of March 2, 2002. Smith also concluded that appellant's limited intellectual function, combined with the effects of the drug use, would have increased "the likelihood that [appellant] will act impulsively, misread social interactions, and respond in a concrete and simplistic manner to situations requiring a more sophisticated solution." Smith stated that appellant's cocaine use "impaired the functioning of his central nervous system, resulting in mood swings, poor impulse control, difficulty with attention and concentration," as well as "poor judgment, difficulty with decision-making, aggressive behavior and distorted perception and memory." In other words, at the time of the instant offense, appellant's "cognitive limitations were significantly increased" by cocaine use.
 {¶ 36} The ninth exhibit was the affidavit of Mark J. S. Heath, M.D., an anesthesiologist, who reviewed the methodology of lethal injection. He also reviewed the risks and concerns related to the administration of the drugs that are used to execute prisoners, and the training of persons who perform lethal injections. Of particular concern to Heath was the risk that, due to improper administration, the drugs could cause *Page 15 
an inmate to "consciously experience excruciating pain during the lethal injection procedures."
 {¶ 37} Exhibit Nos. 10, 11, 12 and 13 were newspaper articles describing executions in Ohio which arguably constituted cruel and unusual punishment. Exhibit No. 14 was a chart prepared by the Ohio Public Defender's Office, detailing the name, age, race, victim, attorney, charge and case status of inmates convicted of capital crimes in Ohio since 1994, which was authenticated by Exhibit No. 15, the affidavit of Terry L. Wilson, administrative assistant to the Ohio Public Defender. Exhibit No. 16 was a demographic profile of Lucas County, Ohio, based on census data recorded in 2000. Exhibit No. 17 was an article from The Cincinnati Enquirer, May 7, 2005, on the subject of the inconsistency and inequality of the death penalty, as it is applied in Ohio.
 {¶ 38} The trial court filed an opinion and judgment entry on October 24, 2007, in which it found that six of appellant's grounds for relief were raised and argued to the Ohio Supreme Court and were, therefore, barred by the doctrine of res judicata. The trial court identified the three remaining grounds as ineffective assistance of counsel due to failure to present statistical evidence of the arbitrary application of the death penalty in Lucas County (sixth ground for relief); failure to raise an equal protection claim based on appellant's race (seventh ground for relief) ; and the inadequacy of Ohio's postconviction procedures (eighth ground for relief). Accordingly, appellant's petition was denied. A timely notice of appeal was filed in this court on November 20, 2007. *Page 16 
 {¶ 39} In his first assignment of error, appellant asserts that the trial court erred by dismissing his claims for relief as res judicata without at least holding a hearing or allowing him to conduct discovery. In support, appellant argues that his claims are not barred by res judicata because they are supported by evidence outside the record as well as evidence that is part of the record. Appellant also argues that he presented sufficient evidence dehors the record to demonstrate that he received ineffective assistance of counsel.
 {¶ 40} R.C. 2953.21, Ohio's postconviction relief statute states, in pertinent part, that:
 {¶ 41} "(A)(1) Any person who has been convicted of a criminal offense or adjudicated a delinquent child and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States * * * may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. The petitioner may file a supporting affidavit and other documentary evidence in support of the claim for relief.
 {¶ 42} "* * *
 {¶ 43} "(C) * * * Before granting a hearing on a petition filed under division (A) of this section, the court shall determine whether there are substantive grounds for relief. In making such a determination, the court shall consider, in addition to the petition, the *Page 17 
supporting affidavits, and the documentary evidence, all the files and records pertaining to the proceedings against the petitioner, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and court reporter's transcript. * * *."
 {¶ 44} R.C. 2953.21 allows for a collateral attack upon a judgment of conviction. State v. McKnight, 4th Dist. No. 07CA665, 2008-Ohio-2435, ¶ 16;State v. Hatton (Aug. 4, 2000), 4th Dist. No. 00CA10. However, "[i]n order to prevail on a postconviction relief petition, the petitioner must establish that he has suffered an infringement or deprivation of his constitutional rights." Id., citing R.C. 2953.21(A)(1); State v. Calhoun (1999), 86 Ohio St.3d 279, 283. The denial of a postconviction petition will not be overturned on appeal absent a finding of abuse of discretion. State v. Williams,165 Ohio App.3d 594, 2006-Ohio-617, ¶ 20. An abuse of discretion connotes more than a mere error of law or judgment, instead requiring a finding that the trial court's decision was unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 45} "A petition for postconviction relief may be dismissed without an evidentiary hearing when the record indicates that the petitioner is not entitled to relief and that the petitioner did not submit evidentiary documents containing sufficient operative facts to demonstrate that the substantive grounds for relief exist." State v.Smith (Feb. 23, 2001), 6th Dist. No. L-99-1310, citing State vKapper (1983), 5 Ohio St.3d 36, 38. In addition, the Ohio Supreme Court has held that the doctrine of res *Page 18 
judicata bars a convicted defendant from raising in a postconviction proceeding any defense or any claimed lack of due process "that was raised or could have been raised * * * at the trial * * *." State v.Perry (1967), 10 Ohio St.2d 175, 180.
 {¶ 46} An exception to the res judicata bar exists in cases where a defendant presents "`new, competent, relevant and material evidence dehors the record.'" State v. Cowan, 151 Ohio App.3d 228, 2002-Ohio-7271, ¶ 15, quoting State v. Redd (Aug. 31, 2001), 6th Dist. No. L-00-1148. However, "[t]o defeat the application of res judicata, the evidence dehors the record * * * must not be cumulative of or alternative to evidence presented at trial. The evidence `must be more than evidence which was in existence and available to the defendant at the time of the trial and which could and should have been submitted at trial if the defendant wished to make use of it.'" State v.Williams, 7th Dist. No. 07 MA 57, 2008-Ohio-1187, ¶ 19, quotingState v. Fears (Nov. 12, 1999), 1st Dist. No. C-990050.
 {¶ 47} In addition, "[w]hen a petitioner asserts ineffective assistance of counsel in a petition for postconviction relief, he bears the initial burden to submit evidence to demonstrate the lack of competent counsel and that the defense was prejudiced by counsel's ineffectiveness." State v. Smith, 6th Dist. No. L-99-1310, supra, citingState v. Pankey (1981), 68 Ohio St.2d 58; State v. Jackson (1980),64 Ohio St.2d 107. In Ohio, a properly licensed attorney "is presumed to execute his duties in an ethical and competent manner." Id. Accordingly, "a petitioner in a postconviction relief proceeding must submit sufficient operative facts or evidentiary material which, if proven, would show *Page 19 
petitioner was prejudiced by said ineffective assistance of counsel." Id., citing State v. Smith (1987), 36 Ohio App.3d 162, 163. Just as a winning defense strategy is not required for effective assistance of counsel, "[debatable tactics do not necessarily constitute a violation of defense counsel's duties." Id., citing State Clayton (1980),62 Ohio St.2d 45, 49. Appellant is required to demonstrate that he was prejudiced by defense counsel's tactics, and not just that a better strategy may have been available. Id., citing State v. Bradley (1989),42 Ohio St.3d 136, paragraph two of the syllabus. Keeping these standards in mind, we will now analyze each of appellant's claims for postconviction relief.
 {¶ 48} In his first ground for relief, appellant asserts that he is mentally retarded, and therefore both his conviction and sentence were obtained in violation of his constitutional rights. In support, appellant argues that his defense was compromised because appointed defense counsel failed to secure a witness with expertise in mental retardation. Appellant further argues that Rheinscheld's affidavit establishes that appellant meets the criteria for mental retardation.
 {¶ 49} The issue of whether appellant is mentally retarded was raised and rejected in appellant's direct appeal to the Ohio Supreme Court.State v. Frazier, 115 Ohio St.3d 139, 2007-Ohio-5048, ¶ 160. Similarly, the Ohio Supreme Court rejected appellant's claim that his defense was compromised by counsel's decision not to present testimony by an expert in mental retardation. Accordingly, those issues are barred by res judicata, *Page 20 
unless appellant has presented new, competent, relevant evidence outside the record that could not, or should not, have been raised at trial.State v. Perry, supra.
 {¶ 50} The United States Supreme Court has held that the execution of a mentally retarded defendant violates the Eight Amendment proscription against cruel and unusual punishment. Atkins v. Virginia (2002),536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335. In order to establish anAtkins claim, a defendant must prove by a preponderance of the evidence that he or she (1) suffers from "significantly subaverage intellectual function," (2) experienced "significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction," and (3) manifested "onset before the age of 18." State v. Lott,97 Ohio St.3d 303, 2002-Ohio-6625, ¶ 12. In addition, "there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70." Id.
 {¶ 51} As set forth above, Smalldon testified at trial that appellant may have limitations in two or more adaptive life skills, and his poor school performance before the age of 18 was documented. However, Smalldon concluded, after interviewing appellant twice and administering a battery of tests, that appellant had a full-scale IQ estimate of 72. Smalldon stated that, although appellant had "borderline low" intelligence, he is not mentally retarded. When questioned regarding the standard error rate on the WAIS-III intelligence test, Smalldon responded that he would not change his opinion, because his evaluation had produced "pretty good numbers." Smalldon also referred to Forgac's conclusion that appellant was not mentally retarded. *Page 21 
 {¶ 52} The only evidence presented to rebut Smalldon's testimony was Rheinscheld's affidavit, in which Rheinscheld stated that the intelligence assessment tests administered by Smalldon have a standard error rate of plus or minus five points. Accordingly, Rheinscheld concluded that appellant is mentally retarded, since his IQ score of 72 is within five points of the upper limit for mental retardation, which is 70. Rheinscheld also stated, based on his review of the trial record, that appellant had significant limitations in at least two adaptive life skills, and his mental difficulties manifested before the age of 18. Accordingly, Rheinscheld's conclusions contradicted Smalldon's testimony that appellant is not mentally retarded.
 {¶ 53} While Rheinscheld came to a different conclusion than Smalldon and Forgac, his affidavit does not contain any evidence that was not available at the time of trial. Similarly, appellant has presented no additional evidence outside the record, other than Rheinscheld's contrary opinion based on a five-point statistical margin of error, to show that his defense was compromised due to Smalldon's and Forgac's lack of expertise in mental retardation. See State v. Elmore, 5th Dist. No. 2005-CA-32, 2005-Ohio-5940, ¶ 45-48. Appellant's first ground for relief has no merit.
 {¶ 54} In his second ground for relief, appellant asserts that defense counsel was ineffective for not ensuring that the results of a complete mental retardation examination were presented at trial. Appellant also asserts that, based on Rheinscheld's affidavit, Smalldon was not qualified to analyze whether or not appellant is mentally retarded. In support, appellant argues that, since Atkins and Lott were decided in 2002, defense *Page 22 
counsel should have been aware of the need to conduct a thorough mental retardation examination and present the results at trial.
 {¶ 55} The Ohio Supreme Court considered and rejected this same issue on direct appeal. Frazier, supra, ¶ 161-167. As set forth above, no exception to res judicata applies, because the record shows that Smalldon testified as to the criteria necessary for a finding of mental retardation pursuant to Atkins, and Rheinscheld's affidavit contains no new evidence dehors the record which was not available at the time of trial. Finally, as recognized by the Ohio Supreme Court, the decision to present testimony by Smalldon, a recognized expert who has testified on the subject of mental retardation in many capital cases, [2] does not constitute ineffective assistance of trial counsel merely because an expert exists who has a contrary opinion. Frazier, supra,¶ 167. Similarly, the decision not to present an Atkins defense based on Smalldon's assessment of appellant does not constitute ineffective assistance of counsel in this case. Appellant's second ground for relief has no merit.
 {¶ 56} In his third ground for relief, appellant asserted that defense counsel was ineffective because his siblings were not asked to testify at the mitigation hearing. In support, appellant argues the jury should have had an opportunity to hear testimony from his brothers, John and Nathaniel, and his sister, Jean, who would have testified regarding their relationship with appellant, in order to "humanize" appellant and demonstrate that he had the support of family members. *Page 23 
 {¶ 57} Generally, where evidence dehors the record "is merely cumulative to that presented at trial," it is not sufficient to establish ineffective assistance of counsel. State v. Smith (Feb. 23, 2001), 6th Dist. No. L-99-1310, citing State v. Powell (1993),90 Ohio App.3d 260, 270. In addition, "the decision whether or not to call a witness is a tactical trial strategy and generally will not sustain a claim of ineffective assistance." Id., citing State v. Williams (1991),74 Ohio App.3d 686, 695.
 {¶ 58} In this case, Smalldon testified as to the quality of the relationship between appellant and his siblings. The affidavits of John, Nathaniel, and Jean Frazier added little to Smalldon's account. In contrast to appellant's argument that his siblings' testimony would have "humanized" him for the jury, John, Nathaniel and Jean each described their adult relationship with appellant as somewhat distant. Accordingly, the mitigation evidence proposed by appellant is not sufficient to overcome the presumption that the decision not to ask appellant's siblings to testify at the mitigation hearing was anything other than a tactical trial strategy. Appellant's third ground for relief has no merit.
 {¶ 59} In his fourth ground for relief, appellant asserts that the failure of defense counsel to present testimony concerning his history of substance abuse violated his rights to effective assistance of counsel, due process, and freedom from cruel and unusual punishment. In support, appellant argues that, although Smalldon testified that appellant used drugs, Smalldon "did not have expertise in the field of drugs and addiction." Appellant relies on the affidavit of Smith who, after reviewing the trial record, concluded that appellant's cognitive functioning was significantly impaired at the time the offense *Page 24 
was committed, due to the combination of his mental disability and his polysubstance abuse.
 {¶ 60} The Ohio Supreme Court has held that a defendant in a capital case is not deprived of mitigating evidence in the form of a substance abuse expert, where the defense presented "`alternative devices that * * * fulfilled] the same functions as the expert assistance sought [by the defendant].'" State v. Foust, 105 Ohio St.3d 137, 2004-Ohio-7006, ¶ 103, quoting State v. Jenkins (1984), 15 Ohio St.3d 164, paragraph four of the syllabus. Such a tactical decision does not constitute ineffective assistance of defense counsel. State v. Frazier, supra.
 {¶ 61} As set forth above, Smalldon testified at the mitigation phase of appellant's trial that the effects of crack cocaine intoxication can include unpredictable and erratic behavior, hyper-arousal, agitation, irritability, inability to sleep for days, "tunnel vision," short-term euphoria, and inability to think of anything other than crack cocaine. Smalldon also stated that, after smoking crack for several days, appellant may have been hallucinating, and experiencing feelings of "intensified desperation" as he attempted to locate more of the drug. In his affidavit, Smith recounted at length the physiological effects of crack cocaine use. In conclusion, Smith opined that appellant's drug use and his already limited cognitive function would have "exacerbated" each other.
 {¶ 62} As noted by the trial court, the Ohio Supreme Court considered and rejected appellant's argument concerning a substance abuse expert, after noting that Smalldon testified as to the extent and effects of appellant's polysubstance abuse. State v. *Page 25 Frazier, supra, ¶ 233. Upon conducting our own review of the record, we find that Smith's affidavit does not constitute new, competent, relevant evidence outside the record that could not, or should not, have been raised at trial. Accordingly, defense counsel's tactical decision to present alternative testimony through Smalldon as to the extent of appellant's substance abuse problem does not constitute ineffective assistance of counsel. Appellant's fourth ground for relief was properly dismissed by the trial court as res judicata and is, therefore, without merit.
 {¶ 63} In his fifth ground for relief, appellant asserts that his conviction is void or voidable because Ohio's death penalty, as administered through lethal injection, violates his right to protection from cruel and unusual punishment under the constitutions of the United States and state of Ohio.
 {¶ 64} "The Supreme Court of Ohio has consistently upheld Ohio's method of lethal injection against Eighth Amendment challenges."State v. McKnight, supra, ¶ 81; State v. Adams, 103 Ohio St.3d 508,2004-Ohio-5845, ¶ 131; State v. Carter (2000), 89 Ohio St.3d 593. In addition, in Baze v. Rees (2008), U.S., 128 S.Ct.1520, L.Ed.2d, the Supreme Court of the United States recently upheld Kentucky's lethal injection procedure against an Eighth Amendment challenge. Several Ohio courts have found that Ohio's lethal injection procedure is substantially similar to the one considered in Baze. McKnight, supra;State v. Bethel, 10th Dist. No. 07AP-810, 2008-Ohio-2697,¶ 62. Accordingly, we cannot find that Ohio's method of lethal injection violates the constitutional prohibition against cruel and unusual punishment under either *Page 26 
the United States' Constitution or the Ohio Constitution. Appellant's fifth ground for relief is without merit.
 {¶ 65} In his sixth ground for relief, appellant asserts that his appointed defense counsel were ineffective because they did not present statistical evidence in support of appellant's claim that the death penalty is applied in an arbitrary manner in Lucas County, Ohio. Similarly, in his seventh ground for relief, appellant asserts that the Lucas County prosecutors have "uncontrolled discretion" to apply the death penalty in an arbitrary, capricious and discriminatory manner, in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Sections 1, 2, 5, 9, 10, 16 and20, Article I, Ohio Constitution. Specifically, appellant argues that evidence of racial disparity in the application of the death penalty "was available to trial counsel but they failed to present such evidence * * *."
 {¶ 66} The Ohio Supreme Court has rejected the argument that the death penalty is unconstitutional because it is applied at the discretion of prosecutors. State v. Jenkins (1984), 15 Ohio St.3d 164, 169-170, certiorari denied (1985), 472 U.S. 1032, 105 S.Ct. 3514. See, also,Gregg v. Georgia (1976), 428 U.S. 153, 199-200, 96 S.Ct. 2909,2937-2938. The rationale for this position is that, "`[a]bsent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts.'" Jenkins, 15 Ohio St.3d, supra, at 169, quotingGregg, 428 U.S. at 225, 96 S.Ct. at 2949 (White, J., concurring). To conclude otherwise would represent *Page 27 
"an indictment of our entire criminal justice system which must be constitutionally rejected." Id. at 170.
 {¶ 67} In addition, both the United States Supreme Court and the Supreme Court of Ohio have refused to accept statistics that purport to show a racial disparity in the imposition of the death penalty as grounds for finding the death penalty to be unconstitutional. State v.Skatzes, 2d Dist. No. 15848, 2003-0hio-516, ¶ 394. Those courts have held that, rather than make a general showing of disparity, a defendant `"must show that racial considerations affected the sentencing processin his case"` for equal protection to be implicated. Id.,¶ 395, quoting State v. Steffen (1987), 31 Ohio St.3d 111, 124, certiorari denied (1988), 485 U.S. 916, 108 S.Ct. 1089. (Emphases original.) See, also, McClesky v. Kemp (1987), 481 U.S. 279, 297,107 S.Ct. 1756, 1769-70, 95 L.Ed.2d 262.
 {¶ 68} Appellant has, admittedly, presented no evidence as to disparate application of the death penalty in Lucas County that could not, or should not, have been presented at trial. Accordingly, absent an exception, appellant's claims are barred by res judicata. State v.Perry, supra. Appellant has presented no evidence to demonstrate that the death penalty was applied in a discriminatory manner in hiscase. Accordingly, no such exception applies, and appellant sixth and seventh grounds for relief are without merit. *Page 28 
 {¶ 69} In his eighth ground for relief, appellant asserts that Ohio's postconviction relief procedures do not provide adequate corrective process. In support, appellant argues that the postconviction process should automatically provide for full discovery and an evidentiary hearing in order to fully develop each of the claims raised in his petition.
 {¶ 70} Ohio courts have consistently held that Ohio's postconviction relief procedure affords adequate corrective process. State v.McKnight, supra, ¶ 1; State v. Clark (Aug. 14, 1998), 6th Dist. No. L-97-1151; State v. Tenace, 6th Dist. No. L-05-1041, 2006-Ohio-1226;State v. Jordan, 6th Dist. No. L-02-1130, 2003-Ohio-5194; State v.Smith, 9th Dist. No. 04CA008546, 2005-Ohio-2571; and State v. Hoop, 12th Dist. No. CA2004-02-003, 2005-Ohio-1407. Appellant is entitled to no more than any other petitioner under the statute. State v. Jordan, supra. Accordingly, appellant was denied neither due process nor equal protection in this case, and his eighth ground for relief is without merit.
 {¶ 71} In his ninth ground for relief, appellant asserted that he was deprived of his constitutional rights due to the cumulative effect of errors made in the trial court.
 {¶ 72} The doctrine of cumulative error states that "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." State v. Garner (1995),74 Ohio St.3d 49, 63. *Page 29 
However, "[t]he doctrine only applies in cases of multiple instances of harmless error." State v. Smith (Feb. 23, 2001), 6th Dist. No. L-99-1310. In this case, we have found no such errors in the trial court's proceedings. Therefore, appellant's ninth ground for relief is without merit.
 {¶ 73} On consideration of the foregoing, we find that the trial court did not err by dismissing appellant's nine claims for relief. Appellant's first assignment of error is not well-taken.
 {¶ 74} In his second assignment of error, appellant asserts that the trial court should have allowed him to conduct discovery to support his claims for postconviction relief. We disagree, for the following reasons.
 {¶ 75} Postconviction proceedings pursuant to R.C. 2953.21 are special statutory proceedings. McKnight, supra, ¶ 105. Pursuant to Civ. R. 1(C), the civil rules, "to the extent that they would by their nature be clearly inapplicable, shall not apply to procedure * * * in all other special statutory proceedings." "Thus * * *, the civil rules do not entitle a petitioner to discovery to help establish substantive grounds for relief in postconviction proceedings." McKnight, supra, quoting State v. Kinley (Nov. 12, 1999), 2d Dist. No. 99 CA 20.
 {¶ 76} This court has held that "[p]ostconviction review itself is not a constitutional right. State v. Steffen (1994), 70 Ohio St.3d 399, 410. (Other citation omitted.) The proceeding is a collateral civil attack on a judgment and is governed by *Page 30 
the postconviction relief statute, R.C. 2953.21. Consequently, a petitioner receives no more rights than those granted by the statute. * * * " State v. Jordan, supra, ¶ 29. It is well-established that R.C. 2953.21 does not require the trial court to allow discovery in the early states of a postconviction proceeding. State v. Smith (Feb. 23, 2001), 6th Dist. No. L-99-1310, citing State v. Fox (May 16, 1997), 6th Dist. No. WD-96-301. See, also, McKnight, supra, ¶ 105; State v. Keith,176 Ohio App.3d 260, 2008-Ohio-741, ¶ 26; State v. Bethel, 10th Dist. No. 07AP-810, 2008-Ohio-2697, ¶ 27. Rather, "[i]t is petitioner's burden initially to submit evidentiary documents containing sufficient operative facts to warrant a hearing. * * *." State v. Rojas (Dec. 29, 1995), 1st Dist. No. C-950091, citing State v. Zuern (Dec. 4, 1991), 1st Dist. Nos. C-900481 and C-910229.
 {¶ 77} This court has reviewed the entire record in this case and, upon consideration thereof, finds that appellant was not entitled to discovery in order to procure evidence in support of his claims for postconviction relief. Appellant's second assignment of error is not well-taken.
 {¶ 78} The judgment of the Lucas County Court of Common Pleas is hereby affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App. R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
 JUDGMENT AFFIRMED. *Page 31 
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist. Loc. App. R. 4.
[1] A petition for a writ of certiorari was filed in the United States Supreme Court, which was denied on April 21, 2008. Frazier v. Ohio, S.Ct., 76 USLW 3567.
[2] See State v. Elmore, supra. *Page 1